TENST CIRCUIT

**Filed 2/29/96**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

————

DIANE D. PARRETT,                      )
                                       )
    Plaintiff-Appellant,          )
                                       )
v.                                     )    No. 95-3146
                                       ) (D.C. No. 93-CV-1308)
RAYTHEON COMPANY, BEECH AIRCRAFT       )  (Dist. of Kansas)
CORPORATION, UNITED BEECHCRAFT,        )
INC., BEECH HOLDINGS, INC., RALPH      )
DELONG and DAVE LAMBERTZ,              )
                                       )
    Defendants-Appellees.         )

————

**ORDER AND JUDGMENT**[*]

————

Before **BRORBY**, **BARRETT**, and **MURPHY**, Circuit Judges.

————

Diane D. Parrett (Parrett) appeals from the district court's

Memorandum and Order of March 10, 1995: granting a motion in limine

to Raytheon Company and its subsidiaries Beech Aircraft

---

[*]This Order and Judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. Citation of unpublished orders and judgments is not favored. Nevertheless, an unpublished decision may be cited if it has persuasive value with respect to a material issue that has not been addressed in a published opinion and it would assist the court in its disposition. A copy of the decision must be attached to the brief or other document in which it is cited, or, if cited in oral argument, provided to the court and all other parties.

Corporation, United Beechcraft, Inc., and Beech Holdings, Inc., Dave Lambertz, and Ralph DeLong (collectively "appellees"); granting appellees' motion for summary judgment on her age discrimination, sexual discrimination, sexual harassment/hostile work environment and retaliation claims; and dismissing without prejudice her state law claim of breach of implied contract.

## Facts[1]

United Beechcraft, Inc. (Beechcraft), owns and operates an aircraft fixed base operation at Wichita's Mid-Continent Airport. From October, 1988, to September 15, 1992, Beechcraft operated three facilities in Wichita: Beechcraft-South, Beechcraft-Central, and Beechcraft-North.

Parrett was hired at Beechcraft-South as a receptionist/merchandise purchasing manager on August 11, 1975. Parrett left Beechcraft in December, 1977, but was rehired in June, 1981. In 1985, her job title was changed, at her request, to customer service representative.

On April 22, 1989, Parrett wrote a lengthy letter to Thomas Phillips, CEO of Raytheon Company, complaining about communications problems, management practices and policies, disrepair of the

---

[1] When reviewing a motion for summary judgment we review the facts in the light most favorable to the non-moving party. Martin v. Nannie and Newborns, Inc., 3 F.3d 1410, 1412 n.1 (10th Cir. 1993).

-2-

facility, treatment of customers, and treatment of employees in general by Line Manager Ralph DeLong (DeLong). (Appellant's Appendix at 94-98). Parrett was contacted by Ron Lance (Lance), Manager of Administration and Personnel for Beech Holdings, Inc., in early June, 1989, and informed that her concerns were being addressed.

On October 10, 1990, Parrett prepared a 17-page "Incident Report" entitled Diane Parrett vs. United Beechcraft. The first portion of the report complained that there was no customer service representative supervisor position to which customer service representatives could aspire. The report proceeded to complain about the "sexist, bigoted," "dictator," behavior of DeLong and the new Assistant Line Manager, Bob Wattson, who was a "willing assistant" to DeLong. (Appellant's Appendix at 104). Specifically, Parrett's report stated that, inter alia: (1) on some unspecified date, DeLong told another female employee at Beechcraft-South, that "we should be made to wear 'hot pants' to go out and park planes like the girls in Salina do;" (2) in 1984, DeLong purchased uniforms for the three women customer service representatives at Beechcraft-South, including Parrett, and that he stayed in the room and watched while her bust, waist, hips, and inseam were measured by the man from the uniform company, although the blinds were drawn to prevent the line technicians outside from observing; (3) in speaking with her, DeLong once referred to

- 3 -

another female employee by stating, "That dumb broad, she can't even go the restroom without asking me;" (4) in speaking to another employee regarding Parrett, DeLong said, "She's as stupid as a whore on South Broadway;" (5) sometime in 1982 she called in sick, Wattson then called her at home and told her that if she performed her part in a local play that evening she would be fired; (6) in January, 1989, she called in sick with pneumonia and Wattson patronizingly said, "Well, I guess we'll just have to chalk it up to the wimp factor;" (7) in December, 1989, Wattson "just blew up and lost his cool" yelling at Parrett while discussing complaints made about her not performing tasks fast enough; and (8) on several occasions, Wattson accused her of errors she had never made and when she did make a $0.10 error he shoved it in her face and said, "Gotcha." Id. at 104-08.

In March, 1991, Parrett delivered a copy of her Incident Report to Nita Long, head of the EEO Department at Beechcraft in Wichita.

On November 22, 1991, Brian Mitchell (Mitchell), a personnel representative for Beech Holdings, Inc., met with Parrett after receiving a telephone call from her. At that time, Parrett gave Mitchell a copy of her Incident Report. After their meeting, Parrett wrote an update to her Incident Report which she sent to Mitchell. The 4-page update contained complaints ranging from the operation of Beechcraft-South to the style of furniture in the

office.  (Appellant's Appendix at 117-120).

Mitchell wrote Parrett on December 11, 1991, stating that management would investigate the issues raised by her in order to achieve a "proper resolution."  He indicated he would contact her at a later date and provided a telephone number for her to contact him in the interim.

In early 1992, the supervisory structure at Beechcraft-South changed.  Dave Simons, the Operations Manager, was reassigned to another facility and replaced, on an interim basis, by Mike Bomstad (Bomstad).  Shortly thereafter, Bomstad directed DeLong to reduce Parrett's work week to Tuesday through Thursday effective February 23, 1992.  In making this decision, Bomstad relied on a misunderstanding that Parrett frequently asked for Monday's and Friday's off to work at the bed and breakfast she ran out of her home.  Parrett immediately complained to Mitchell that she had not repeatedly asked for Monday's and Friday's off to work at her bed and breakfast and that she did not want a three-day work week. Within ten days Parrett was reinstated to a full five-day schedule.

In March, 1992, Bomstad was replaced by Alden Lange (Lange). In addition, Eric Larson (Larson) replaced Wattson as Assistant Line Manager and Parrett's immediate supervisor.

About this time, Parrett heard that Diane Pruitt was leaving her position doing fuel farm accounting.  Parrett sent her resume to Dave Lambertz (Lambertz), Business Manager in Wichita.  Lambertz

informed her that he was looking for someone with an accounting degree. In July, 1992, Lambertz and Lange interviewed and hired Anna Isenhour (Isenhour) for the accounting position. Until that time, Isenhour had been a customer service representative/receptionist at Beechcraft-South. Although Isenhour did not have an accounting degree, she had experience in operations management of aviation fixed based operations, experience and training in accounting, and had taken a number of college courses in both accounting and computing.

On September 15, 1992, Beechcraft combined the operations of its north and south facilities, closing Beechcraft-South. As a result, Parrett's customer service representative position at Beechcraft-South was eliminated and she was transferred to a receptionist position at Beechcraft-Central. Connie Thomas, who had held the receptionist position at Beechcraft-Central, moved into the position of sales secretary working directly for Ken Shultz.

In November, 1992, Beechcraft experienced a further reduction-in-force in which Parrett's receptionist position at Beechcraft-Central was eliminated. Lambertz determined that Parrett lacked the experience to perform any of the available positions and notified her of her layoff on November 13, 1992. In a meeting with Lambertz and Wes Bishop, Parrett opted to list her status as "terminated" rather than "layoff" in order to receive her 401K plan

benefits immediately.

On January 26, 1993, Parrett filed a sworn written complaint with the Kansas Human Rights Commission and the Equal Employment Opportunity Commission (EEOC). After an attempt at an administrative resolution failed, the EEOC issued her a right to sue letter on July 15, 1993.

On August 20, 1993, Parrett initiated this action against appellees alleging violations of Title VII, 42 U.S.C. § 2000e et seq.; violations of the Civil Rights Act of 1991 and 42 U.S.C. § 1981(a); age discrimination; and breach of implied contract of employment. In addition, Parrett alleged that appellees withheld and altered material evidence relating to her age discrimination claim.

On August 18, 1994, appellees filed a Motion in Limine to exclude from the trial any reference to or testimony regarding Parrett's allegation that appellees tampered with an October 8, 1993, memorandum from Lambertz to Lange. On December 27, 1994, appellees filed a Motion for Summary Judgment on all of Parrett's claims.

On March 10, 1995, the district court granted appellees' motion in limine; granted appellees' motion for summary judgment on Parrett's discrimination and retaliation claims; and dismissed her state law claim for breach of implied contract without prejudice. On April 13, 1995, the district court denied Parrett's motion for

reconsideration.

<u>Issues</u>

On appeal, Parrett contends that the district court erred in (1) granting appellees' motion in limine to exclude evidence relating to her allegation of document tampering, and (2) in granting appellees' motion for summary judgment on her claims of age discrimination, sexual discrimination, sexual harassment/hostile work environment, and retaliation.[2]

<u>Discussion</u>

I.

Parrett contends that the district court erred in granting appellees' motion in limine to exclude evidence of her allegation of document tampering. Parrett alleges that appellees altered an October 8, 1992, memorandum from Lambertz to Lange which was highly relevant to her age discrimination claim. Parrett claims that on the original memorandum birth dates had been handwritten in the margin next to five employees' names, including hers, which were not there when appellees' returned the memorandum after borrowing it.

---

[2]    Parrett does not contest the district court's dismissal without prejudice of her state law claim of breach of contract. Therefore, this issue is abandoned. <u>See</u> <u>Crow Tribe of Indians v. Repsis</u>, ___ F.3d ___,___ n.5 (10th Cir. 1995).

The evidentiary rulings of the district court are reviewed for an abuse of discretion. Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1433 (10th Cir. 1993). Under this deferential standard of review, a district court will be reversed only if we have a firm and definite belief that the district court made a clear error in judgment. Id. (citing Gilbert v. Cosco Inc., 989 F.2d 399, 402 (10th Cir. 1993)).

After careful review of the record, we conclude that the district court did not abuse its discretion in excluding any reference to the alleged alteration of the October 8, 1992, memorandum. The author of the memorandum, Lambertz, testified that he did not put any dates on the memorandum and he had never seen any dates on the memorandum. (Defendants/Appellees' Supplemental Appendix, Vol. II at 331-333). In addition, the district court found that: the report of Parrett's forensic document examiner failed to identify any evidence of document tampering and, in fact, concluded that the copy provided to Parrett was a copy of the same document used in a suit prior to the tampering allegations which had never been removed from the possession of Parrett's counsel; Lambertz testified that "an internal Beech memo was generated from Wes Bishop to Ron Lance on November 5, 1992, which identified various individuals for recommended layoffs, and also listed the date of hire (rather than birth) for each employee;" the November 5, 1992, document could easily have been mistaken for the

allegedly altered document; and the only person to have actually seen a document with both employees' names and dates on it only inferred that the dates were birth dates and could not remember the particular dates in question. (Appellant's Appendix at 27-32). Therefore, the district court concluded that "[s]et against the minimal probative value of [Parrett's] evidence is the direct statement of the [appellees] that there has been no manipulation and the clear prejudice arising from the assertion of a deliberate falsification of evidence." Id. at 30. Based on the foregoing, we conclude that the district court did not abuse its discretion in granting appellees' motion in limine.

## II.

Parrett contends that the district court erred in granting appellees' motion for summary judgment on her discrimination claims. The district court granted summary judgment dismissing Parrett's sexual discrimination, sexual harassment/hostile work environment, and age discrimination claims as untimely and granted summary judgment on her retaliation claim on the grounds that there was a "complete lack of any evidence suggesting that the acts complained of were caused by Parrett's participation in protected activity." (Appellant's Appendix at 42).

This court reviews a grant of summary judgment de novo. "We apply the same legal standard used by the district court under Fed.

R. Civ. P. 56(c) and examine the record to determine if any genuine issue of material fact was in dispute; if not, we determine if the substantive law was correctly applied." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Wolf v. Prudential Ins. Co. of Am., 50 F.3d 793, 796 (10th Cir. 1995) (citing Applied Genetics, 912 F.2d at 1241). When applying this standard, we examine the factual record and reasonable inferences therefrom in the light most favorable to the non-moving/opposing party. Wolf, 50 F.3d at 796. The opposing party, however, must identify sufficient evidence to require submission of the case to a jury. Jones v. Unisys Corp, 54 F.3d 624, 628 (10th Cir. 1995). We affirm the district court's decision to grant summary judgment if the record contains any basis to do so. Swoboda v. Dubach, 992 F.2d 286, 291 (10th Cir. 1993).


A. Title VII Claims

Parrett contends that the district court erred in granting summary judgment to appellees on the grounds that her Title VII sexual discrimination and sexual harassment/hostile work

environment claims were untimely.

In Kansas, a plaintiff must file Title VII discrimination charges within 300 days after the alleged discriminatory act occurred.[3]  42 U.S.C. § 2000e-5(e)(1).  Parrett filed her complaint with the Kansas Human Rights Commission on January 26, 1993.  Thus, her claim is timely only with respect to discriminatory acts which occurred after April 1, 1992.

All of the specific acts of discrimination and of a hostile work environment complained of by Parrett occurred while Wattson was Assistant Line Manager under DeLong.  However, Larson replaced Wattson as Assistant Line Manager on March 16, 1992.  Therefore, Parrett's Title VII claims were untimely and in order for her untimely Title VII claims to survive, she must prove that a continuing violation existed.[4]

To invoke the continuing violation exception to the Title VII charge-filing deadlines, Parrett must show either (1) a series of related acts taken against a single individual, one or more of which falls within the limitations period, or (2) the maintenance

---

[3]     The 300 day limitation applies in those states that have statutorily prohibited sexual discrimination.  Otherwise the limit is 180 days.  42 U.S.C. § 2000e-5(e).

[4]     The timely filing of a discriminatory charge may also be equitably tolled where a plaintiff has been "actively deceived" causing her filing to be untimely.  Purrington v. University of Utah, 996 F.2d 1025, 1030 (10th Cir. 1993); Martinez v. Orr, 738 F.2d 1107, 1110 (10th Cir. 1984).  However, this argument was not raised in the district court and, therefore, cannot be considered on appeal.

of a company-wide policy of discrimination both before and during the limitations period which evidences a pervasive, institutionalized "system" of discrimination. Purrington v. University of Utah, 996 F.2d 1025, 1028-29 (10th Cir. 1993); Bruno v. Western Elec. Co., 829 F.2d 957, 961 (10th Cir. 1987).

While Parrett asserts that she has continually been subjected to sexual discrimination and a hostile work environment, she does not point to any specific incidents of discrimination or harassment which occurred after April 1, 1992. The only mention of continuing discrimination and harassment after April 1, 1992, is found in her affidavit submitted in response to appellees' motion for summary judgment, wherein she asserted that:

> 33. During the short time Eric Larson took over as Assistant Line Manager, which was only approximately six months, he made conditions more tolerable, but he did not have the power to correct the ongoing discriminatory policies. This did not change the workplace environment, it did not give me an opportunity for equal advancement, nor keep me from being subject to sexual innuendos all around me, or anything else. The basic work "environment" did not change, although Eric's management style made it more enjoyable. Female Customer Service Reps were still subject to sexually oriented comments from customers on an ongoing basis, such as "she must have PMS", "darling", "sweetie" or "cupcake".

(Appellant's Appendix at 67) (emphasis added).

Parrett's only continuing complaint is that her discriminatory work environment has not changed because she is still subject to sexually oriented jokes and innuendos from customers. However, Title VII, 42 U.S.C. §§ 2000e et seq., protects an employee from

unlawful employment practices of the <u>employer</u>. Section 42 U.S.C. § 2000e-2 provides:

(a) **Employer practices**
It shall be an unlawful employment practice for an employer --
(**1**) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(**2**) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

Taking Parrett's affidavit in the light most favorable to her, there are no allegations of discriminatory acts which occurred after April 1, 1992, which rise to the level of a violation of her civil rights under Title VII, 42 U.S.C. § 2000e-2.

In addition, the district court found that Parrett's assertions in her affidavit of February 14, 1995, were an attempt to create a "sham issue" because they egregiously contradicted her earlier deposition testimony. (Appellant's Appendix at ). We agree.

In her deposition on November 16, 1993, Parrett testified in response to direct questions by counsel that:

A. After Eric took over there was a very noticeable improvement in everything. Everyone responded to him. He was fair and treated everyone as equals.

* * *

Q. What do you claim, if anything, was the hostile work environment directed to you during your working shift when Eric Larson was your immediate supervisor?

A. When Eric took over, things were a lot better. There were not the comments made to us. There were not the differences in treatment. He immediately gave me a key to access the cabinets where the supplies were kept. He immediately went back to talking to me about ordering merchandise and being willing to delegate some authority and let you take a part in taking care of day-to-day operations, whereas Bob [Wattson] had kept all of that to himself and would not let me have any control over anything, even if it was my own work area. He would not release that.

Q. Do you claim there was any hostile work environment because of your sex while Eric Larson was your immediate supervisor on or after March of 1992?

A. As far as from a management standpoint, the way he treated me, no. There was always some underlying thing with linemen, but not as far as with Eric. He was very fair.

Q. In reference to the work area that Eric Larson had responsibility over, what do you claim, if anything, was the hostile work environment directed toward you because of your sex?

A. He improved that a lot. I really just right now could not recollect anything. If anything, he improved situations a lot with the treatment because of the women that were there.

(Defendants'/Appellees' Supplemental Appendix, Vol. VI at 1321 & 1334).

Parrett has failed to produce any evidence of a continuing violation. She has not alleged any specific incidents of discrimination which occurred within the limitations period to substantiate a continuing violation based on a series of related acts nor has she adduced any evidence of a pervasive company-wide

policy of discrimination. Hence, we hold that the district court properly granted appellees summary judgment on Parrett's Title VII discrimination claims.

## B. Age Discrimination

Parrett contends that the district court erred in dismissing her age discrimination claim brought under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., as untimely. The district court considered Parrett's age discrimination claim together with her Title VII discrimination claims and found that they were all untimely because they were not filed within 300 days of the alleged discriminatory acts. (Appellant's Appendix at 42).

Similar to Title VII, 42 U.S.C. § 2000e-5(e), the ADEA requires that a plaintiff file age discrimination charges within 300 days after the alleged discriminatory act occurred.[5] 29 U.S.C. § 626(d)(2). Therefore, because Parrett filed her complaint with the Kansas Human Rights Commission on January 26, 1993, her age discrimination claim is timely only with respect to discriminatory acts which occurred after April 1, 1992.

Parrett based her age discrimination claim on three incidents: (1) in June, 1981, Lambertz and Lange hired the younger Isenhour over her for the fuel farm accounting position; (2) in November,

---

[5]     The 300 day limitation applies in those states that have statutorily prohibited sexual discrimination. Otherwise the limit is 180 days. 29 U.S.C. § 626(d)(2).

1992, her seniority should have "bumped" her into Isenhour's fuel farm accounting position instead of being terminated when her receptionist position was eliminated; and (3) in December, 1992, she was not rehired after Dee Zogelman resigned her position as a customer service representative just six weeks after Parrett's termination. Since all of these events occurred after April 1, 1992, Parrett's age discrimination claims were timely. However, we must now consider whether a genuine issue of material facts exists which would prevent summary judgment.

ADEA plaintiffs may establish discrimination indirectly through the three-part framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny. MacDonald v. Eastern Wyo. Mental Health Ctr., 941 F.2d 1115, 1119 (10th Cir. 1991). Under the McDonnell Douglas test, the plaintiff bears the burden of establishing a prima facie case of discrimination. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). Establishment of a prima facie case creates a presumption of unlawful discrimination that requires a defendant to come forward with evidence of a legitimate nondiscriminatory reason for the challenged action. MacDonald, 941 F.2d at 1119. If the defendant offers evidence of a legitimate nondiscriminatory reason for its employment decision, "the presumption of discrimination established by the prima facie showing simply drops out of the picture." Ingels v. Thiokol Corp, 42 F.3d 616, 621 (10th Cir. 1994). The

plaintiff must then offer evidence that age was a determining factor in the challenged decision by either showing that the defendant's proffered reasons were really a pretext for age discrimination or by producing direct evidence of age discrimination. Jones, 54 F.3d at 630. At the summary judgment stage, if the plaintiff produces both a prima facie case and evidence supporting a finding that "defendant's alleged nondiscriminatory reasons for the employment decisions are pretexual, the case should go to the factfinder." Ingels, 42 F.3d at 622. We must first determine whether Parrett established a prima facie case on any one of her claims.

A plaintiff establishes a prima facie case of age discrimination by showing that she was (1) within the protected age group; (2) doing satisfactory work or qualified for the position; (3) discharged or adversely affected by the employer's decision; and (4) replaced by a younger person. Jones, 54 F.3d at 630. "In reduction in force cases, because a plaintiff is not always replaced with another employee, we modified the McDonnell Douglas burden-shifting scheme so that a plaintiff may demonstrate the fourth element by producing 'evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue.'" Id. (quoting Branson v. Price River Coal Co., 853 F.2d 768, 770 (10th Cir. 1988)). The fourth element may also be shown by

circumstantial evidence that a plaintiff was treated less favorably than younger employees. Rea v. Martin Marietta Corp., 29 F.3d 1450, 1454 (10th Cir. 1994).

Parrett alleges that she was discriminated against based on her age when Isenhour, who is much younger than Parrett, was given the fuel farm accounting position and when Isenhour was retained in that position during the reduction in force. In establishing a prima facie case, it is clear that Parrett was in the protected age group, over 40; adversely affected by the decision; and replaced by a younger person, Isenhour, who was in her early twenties. Of critical importance to her claims is whether she was qualified for the fuel farm accounting position. See Kenworthy v. Conoco, Inc., 979 F.2d 1462, 1470 (10th Cir. 1992) (in failure to promote case, plaintiff could make a prima facie showing through credible evidence that she was qualified for the position she sought, even if that evidence was disputed by her employer).

The most credible evidence of Parrett's qualifications for the fuel farm accounting position is found in her resume which she voluntarily sent to Lambertz as an application for that position. The fuel farm accounting position required, inter alia, personal computing skills; knowledge and use of Lotus 1-2-3 and Dbase; and accounting and general ledger experience and skills. Although Parrett's resume lists an extensive array of skills and experiences, it is devoid of any personal computing skills,

- 19 -

knowledge or use of Lotus 1-2-3 or Dbase and lacking in accounting experience.[6] (Appellant's Appendix at 121-123). Without these primary skills and experiences, Parrett is not qualified for the fuel farm accounting position.

Finally, Parrett claims that she was discriminated against when she was not rehired/recalled and a younger woman was transferred from the warranty department into the customer service representative position vacated by Dee Zogleman six weeks after Parrett was terminated. At the time Parrett was notified her receptionist position was being eliminated, she was given the choice to list her status as "terminated" or "layoff." If she chose "layoff" she was subject to recall, but had to wait a minimum of six months to receive her 401K plan benefits. However, if she chose "terminated" she would receive her 401K plan benefits immediately. For personal reasons, Parrett chose to list her status as "terminated" in order to receive her benefits sooner. Therefore at the time the customer service representative position became vacant, Parrett was not subject to recall. She could apply for any positions that came available like any other member of the public. However, Beechcraft was under no obligation to call and offer her the job.

---

[6] In our independent review of the record, we discovered that Parrett took one college class in financial accounting in which she received a grade of "C." This alone is insufficient to qualify her for the fuel farm accounting position.

Accordingly, Parrett has failed to establish a prima facie case of age discrimination. Hence, the district court properly granted summary judgment in favor of appellees.

## C. Retaliation Claim

Parrett contends that the district court erred in granting appellees' summary judgment motion with respect to her retaliation claims. The district court found that summary judgment was appropriate as to Parrett's retaliation claims because of a "complete lack of any evidence suggesting that the acts complained of were caused by Parrett's participation in protected activity." (Appellant's Appendix at 42).

Parrett asserts that appellees retaliated against her for writing her April 22, 1989, letter to Phillips, for submitting her Incident Report and the update in 1991 to Mitchell, and for filing this Title VII action with the EEOC and KHRC. Parrett claims that in retaliation for her actions Appellees: cut her schedule to a three-day work week; never gave her the opportunity to interview for other positions during the reduction in force, although her seniority should have permitted her the opportunity to remain with the company; and did not bring her back to work six weeks after she was terminated when Dee Zogelman resigned her position.

To establish a prima facie case of retaliation a plaintiff must show that (1) she was engaged in a protected opposition to

Title VII discrimination or participated in a Title VII proceeding; (2) she was disadvantaged by an action of her employer subsequent to or contemporaneously with such opposition or participation; and (3) there is a causal connection between the protected activity and the adverse employment action. Daniel v. Loveridge, 32 F.3d 1472, 1475 (10th Cir. 1994); Burrus v. United Tel. Co. of Kan., Inc., 683 F.2d 339, 343 (10th Cir.), cert. denied, 459 U.S. 1071 (1982). "The causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct followed by adverse action." Burrus, 683 F.2d at 343.

The district court found that Parrett's letter of April 22, 1989, was not the product of protected conduct because it failed to raise any issues of gender or age discrimination; therefore it could not serve as the basis for a claim of retaliation. (Appellant's Appendix at 42 n.2). We agree. Although Parrett's April 22, 1989, letter raises many issues, it fails to allege any discriminatory actions which would amount to a violation of Title VII. In addition, Parrett's filing of her complaint with the EEOC and the KHRC cannot be the basis of a retaliation claim, inasmuch as these filings were made well after Parrett's employment with appellees had been terminated.

Parrett's only allegations of Title VII discrimination are found in her Incident Report which she distributed in March and

November of 1991. The only adverse job action chronologically proximate to Parrett's publication of her Incident Report was the temporary reduction in her work week to Tuesday through Thursday which occurred in February, 1992. However, it is uncontroverted that this reduction was caused by Bomstad's mistaken belief that she wished to have Monday's and Friday's off and that he did not know of her Incident Report before instituting her new schedule. In addition, Parrett was returned to her normal five-day work week within ten days. We have previously held that a "plaintiff must show that the individual that took adverse action against [her] knew of [her] protected activity." Williams v. Rice, 983 F.2d 177, 181 (10th Cir. 1993). Accordingly, we agree with the district court that this brief adverse job action cannot serve as a basis for a claim of retaliation.

With respect to Parrett's remaining claims that she was retaliated against because appellees failed to give her the opportunity to interview for available jobs during the reduction in force and that appellees failed to recall her six weeks after she was terminated, the district court found "a complete lack of any evidence suggesting that the acts complained of were caused by Parrett's participation in protected activity, here, by submitting the incident report and its update in late 1991." (Appellant's Appendix at 42). After careful review of the record, we hold that Parrett failed to demonstrate a causal connection between her

protected activity and adverse action by the appellees.  Summary judgment on Parrett's retaliation claims was proper.

**AFFIRMED.**

Entered for the Court:

James E. Barrett,
Senior United States
Circuit Judge