**Shirley J. PATTERSON a/k/a Helton, Plaintiff,**

v.

**SEK–CAP, INC., a Kansas corporation, and Bud Corn, Defendants.**

**No. 96–1135–JTM.**

United States District Court, D. Kansas.

Nov. 12, 1998.

## MEMORANDUM ORDER

MARTEN, District Judge.

This is an action by Shirley Patterson against her former employer SEK–CAP, Inc. based upon the acts of Headstart Director Bud Corn. As Director, Corn oversees a ten-county operation for Headstart, with an enrollment of approximately 651 children. Patterson alleges that she was sexually harassed by Corn. Currently pending before the court is SEK–CAP's motion for summary judgment. For good cause shown, the defendant's motion for summary judgment is hereby granted.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital,* 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.,* 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir.1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita* ). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Patterson filed her charge with the Kansas Human Rights Commission on March 11, 1994. It alleged continuing discrimination between September of 1988 to September of 1993. There is a series of discrete events alleged in the petition, all but one of which occurred before May 19, 1993 (300 days before the filing of the KHRC petition). The petition alleges that (1) beginning in September, 1998, Headstart Director Bud Corn, Patterson's supervisor, gave her numerous compliments and directed attention to her; (2) in the Fall of 1989, Corn attempted to set up Patterson with one of his friends; (3) Corn continued to compliment her, and told her he missed her when she was not in the office, and called her during school breaks at home; (4) in January of 1990, Corn made comments about "knocking" her boyfriends "out of the saddle" if he were younger, asked her personal questions, and would offer to accompany her home from work; (5) on February 8, 1990, Corn made joking threats that he would fire her if she did not start giving him hugs; (6) during the same month, Corn found out Patterson had told other employ-

ees about these joking threats, and became angry for a long time; (7) later in 1990, Corn made sexually suggestive remarks concerning a trip they were to make to Kansas City; (8) in 1991, Corn kissed her and touched her breasts against her will on two occasions, made comments of a sexual nature, asked about her dating habits, called her home and left messages, and wrote her notes and poems; (9) on January 28, 1992, Corn told her that he was in love with her, causing her to seek medical help; (10) in December, 1992, Corn became angry with her and continued to pry into her personal life after he learned that she had told other employees she was keeping notes on the alleged sexual harassment; and (11) an altercation between Corn and Patterson occurred in September of 1993.

Patterson recounted her version of the September, 1993 incident in her deposition. According to her, she had a dispute with a female co-worker regarding a CPR card at a staff meeting. They had a discussion about the matter in the "printing room" when it turned into an argument and another staff member, "Mary Ann" was brought into it. Patterson's voice was raised, but she did not curse. She became frustrated and left. Patterson later discussed the argument with non-Headstart SEK–CAP staff member Carveth Neer.

After Patterson came to the central SEK–CAP office, she got a note from Corn stating he wanted her to prepare the week's schedule and bring it to him. When she did, he told her that he knew of the argument and that they were going to discuss it. Patterson told Corn she did not want to discuss it and Corn said he wanted to discuss it. Corn said in the future he wanted arguments to be out of the office. Patterson stated it was an office matter and should be discussed in the office. Corn became upset and gave her "tongue lashings." (Patterson dep. at 21). Corn simply did not want an argument happening in the office.

Patterson's discussion with Corn became louder and more heated when it was taken outside the office. Patterson felt she was being "set up." (Id.) At some point, Corn insisted they go back into the office to see if Patterson's co-workers would back her up. When they went back inside, there were only three co-workers present. Corn chewed her out in front of them. At one point, he told a "bold faced lie," and she wanted to go to the Executive Director but Corn refused. Patterson asked Corn to fire her, but he refused. Plaintiff then became hysterical and "began hyperventilating." (Patterson dep. at 26). When she recovered, she drove home and never returned to work.

Patterson conceded in her deposition that she has no personal knowledge that Corn's motive in the confrontation was based on sex. Asked why she thought this event was the result of sexual harassment, Patterson stated that her friend Kenneth Dirks had told Jim Garrison, the Executive Director of SEK–CAP, that she was engaged to be married, and that if "Mr. Garrison knew, Bud knew." (Id., at 28). Garrison is Corn's immediate supervisor. He has testified that he never told Corn of Patterson's engagement. Aside from this, Patterson has no evidence that Corn knew of her engagement. (Id., at 36).

After the confrontation, Patterson wrote to Garrison, absolving him of any claim of sexual harassment and then, for the first time, recounted her allegations against Corn. She wrote that she was in "counsel" with the late Rev. Willie Murray (the SEK–CAP EEO officer) and that she had an excellent case because of "letters, tapes, witnesses, documentation and medical records." (Garrison dep. exh. 4). Patterson stated that Garrison had acted like a gentleman towards her, and asked for a meeting with him, at Murray's suggestion.

At the meeting, Patterson explained the contents of the letter. She asked Garrison what she could do but offered no suggestion and made no specific request of Garrison. Garrison told her that she could stay with Headstart and work directly for him. Patterson rejected this offer.

Garrison testified that he did not know anything of the harassment allegations until after the September, 1993 confrontation, and that he would be shocked if the allegations were true. He investigated the allegations, but found no other employees who would comment on them one way or another. Ultimately, Garrison was unable to reach a con-

clusion as to the truth of the allegations in his own mind.

On November 8, counsel for SEK–CAP asked to review the documentation Patterson had referred to in her meeting with Garrison. Counsel for Patterson responded that the previous information supplied to the defendant should be sufficient for an investigation.

Corn has denied all Patterson's allegations.

Headstart Policy Manual 70.2 "The Parent" provides that a Headstart Policy Council be set up at the grantee (SEK–CAP) level, made up of Headstart parents and representatives of the community. The regulations provide that the policy council approve the hiring and firing of the Headstart director and staff.

At her October, 1996 deposition, it was discovered that most of Patterson's notes were in the possession of her former attorney. Plaintiff's attorney stated the documentation would be retrieved, and the deposition was set for June 23, 1997, along with the depositions of Corn and Garrison. Patterson did not appear at the deposition because she had locked her keys in the car, but her "documentation" was introduced as Exhibit 10 in Corn's deposition. It is uncontroverted that these notes indicate a group of events, including a sexual advance in which Corn grabbed Patterson, kissed her, and put his hands on her breasts, in the three months beginning in December, 1989 to February, 1990. There followed a period of ten months in which Patterson's notes indicate that things were going pretty well and that Corn made remarks so seldom she had stopped worrying. In December, 1990, Corn grabbed her and kissed her, which enraged Patterson.

There was then a period of eleven months in which no events were reported until November of 1991, when Corn called Patterson into his office and read a poem to her. The next month, Corn made a comment about her being homeless and taking people in, made a comment about her unbuttoning her dress all the way down, and bumped her shoulder and stared down the front of her sweater, commenting how good she looked. In January, 1992, Corn made phone calls to her home, had a long conversation with her, and called her again when he was drunk and talking crazy. Patterson started to lose sleep. She confronted Corn on February 4, 1992, and he asked if he had been bothering her. She told her co-workers everything.

No events regarding Corn are listed for the period between February 4, 1992 to January, 1993. The next series of notes in Patterson's spiral notebook involve not Corn but Garrison, who Patterson states forced her to dance with him at the 1992 Christmas party and kissed her on the cheek twice.

Of the contemporaneous documentation supplied by Patterson, these were the last notes in the spiral notebook. There is a separate note dated April 10, 1993 in which Patterson is requesting leave, and notes of phone calls made by Corn in early 1992, a note dated March 1991 stating Corn had kissed her, a note indicating that Corn had kissed her in September of 1992, a January 25, 1993 note indicating Darlene and Ellen asked her if she had told anybody she was going to file a sexual harassment suit, a January 29, 1993 note about an employee named Debbie Reedy, a February 4, 1993 note about various medical symptoms and indicating Corn talked about allegations of sexual harassment with Patterson. Patterson told Corn she was sick of taking the heat from Garrison. When Corn asked if she felt that he (Corn) had harassed her, Patterson said the incident in the shop (which occurred a couple of years before) but that was the only issue. Corn said that he really did not want to lose her, because she was a neat person and doing a good job.

As to Corn's behavior, Patterson's notes are silent from February, 1992 to September of 1993.

SEK–CAP has a published grievance procedure for complaints of harassment. The first step is to contact the EEO officer.

Patterson received raises commensurate with other persons, and she was given good evaluations.

***Conclusions of Law***

SEK–CAP offers two rationales for its motion for summary judgment. It argues that Patterson has failed to demonstrate a hostile environment during the 300 days prior to the filing of her complaint and that the evidence does not support a finding of a continuing

violation, and that in any event it is entitled to the protection of the affirmative defense articulated in *Faragher v. City of Boca Raton*, 524 U.S. 775, ——, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) and *Burlington Industries v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

 The court finds summary judgment is appropriate on both grounds. It is clear from the uncontroverted facts that the only incident at all involving Corn and Patterson within 300 days before the EEOC charge occurred in September of 1993. The plaintiff, however, suggests that this incident was the product of a continuing series of events reflecting Corn's treatment of Patterson. To demonstrate a continuing violation exception to the filing requirements of Title VII based upon a series of related acts, the plaintiff must "show that the acts rise to the level of a 'dogged pattern' of discrimination as distinguished from 'isolated and sporadic outbreaks.'" *Purrington v. University of Utah*, 996 F.2d 1025, 1029 (10th Cir.1993), quoting *Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971, 981 (5th Cir.1983). Relevant factors towards this inquiry include "(1) whether the alleged acts involve the same type of violation, (2) whether the acts are recurring versus isolated; and perhaps most important, (3) whether the acts have the degree of permanence which should alert the employee to the duty to assert her rights." Id., citing *Berry*, 715 F.2d at 981.

 What is striking here is that the conduct which Patterson ascribes to Corn is marked not only by its extremely episodic nature, in which long periods pass before a new group of events occur, but that the single incident in September of 1993 is of a clearly different character than that which occurred earlier. No sexually suggestive language was used. No physical touching occurred. No poetry was read or other romantic language used. At the time of the September, 1993 incident, the evidence indicates that no suggestive language or physical touching had occurred for over a year and a half. Other than Patterson's speculations, not based on any personal knowledge, there is no evidence that Corn knew of Patterson's marriage or that sex played any role in his treatment of her at that time. There is simply no support for the suggestion that the September, 1993 incident was a constructive discharge based upon sex discrimination.

As to the *Faragher / Burlington* affirmative defense, the Supreme Court summarized this defense in the following terms:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, *see* Fed.Rule Civ.Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Burlington*, 524 U.S. at ——, 118 S.Ct. at 2270, *Faragher*, 524 U.S. at —— – ——, 118 S.Ct. at 2292–93.

The facts set out in the present action establish the defense is appropriate here. The plaintiff in her response argues the defense is simply inapplicable because there was a constructive discharge, and hence an

adverse employment action by a supervisor—she does not argue that the defense is otherwise unsupported by the facts. The court finds this argument unacceptable in light of the uncontroverted facts, which disprove any constructive discharge by Corn. There is no evidence that the circumstances of Patterson's employment had become intolerable to a reasonable person. Nor does Patterson show why the offer of working directly for Garrison was unacceptable.

As to the elements of the defense, it is uncontroverted that the defendant had a procedure in place for dealing with harassment claims. Garrison acted promptly to investigate Patterson's claims when they were first brought to his attention. Patterson, in contrast, never raised any claims of harassment against Corn until after she left work in September, 1993, and even then failed to assist in the investigation by showing Garrison copies of her "documentation."

IT IS ACCORDINGLY ORDERED this 12th day of November, 1998, that the defendant's motion for summary judgment is hereby granted.