**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 7 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

BARBARA J. HOLMES,

     Plaintiff-Appellant,

v.

REGENTS OF THE UNIVERSITY OF
COLORADO,

     Defendant-Appellee.

No. 98-1172
(D. Colo.)
(D.Ct. No. 97-N-1231)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **BRORBY**, **HOLLOWAY**, and **BRISCOE**, Circuit Judges.

_____

     Plaintiff-Appellant, Barbara J. Holmes, Ph.D. (Dr. Holmes), appeals a

district court order granting summary judgment in favor of the Regents of the

University of Colorado. Dr. Holmes alleges she suffered age and race

discrimination while employed by the University of Colorado at Denver (the

University) and seeks damages under the Age Discrimination in Employment Act

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

(ADEA), 29 U.S.C. §§ 621 - 634; Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e - 2000e-17, *amended by* Civil Rights Act of 1991, 42 U.S.C. § 1981a; and 48 U.S.C. § 1983. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

## I. Background

Dr. Holmes is a sixty-four-year-old African-American woman hired by the University as an Associate Professor and Chairperson of the school's Communications Department in June 1992. She originally negotiated and signed a three-year contract with the University for a tenure-track position at a salary commensurate with the national average for similar institutions. Her salary included additional compensation for her duties as Chairperson. However, Dr. Holmes' term as Chairperson of the Communications Department was short-lived. In September 1993, the University removed her from the position based on complaints that: (1) she was not pursuing a course of development for the department the other faculty members agreed with; (2) she was not listening to input from other faculty members; (3) she was not performing the research and publication necessary to achieve tenure; and (4) the department was suffering from significant internal strife under her leadership. Following her removal, Dr. Holmes pursued no immediate legal action against the University and continued

in her position as an associate professor.

In the fall of 1994, Dr. Holmes underwent her three-year tenure review. Based in part on a positive review and the recommendation of her colleagues in the Communications Department, the University reappointed Dr. Holmes as an associate professor for two more years. Despite successfully maintaining her employment with the University and being the highest paid professor in the Communications Department, Dr. Holmes asserts she was the victim of numerous instances of age and race discrimination throughout the time of her employment.

In August 1996, nearly three years after her removal as Chairperson of the Communications Department, she sued the University in Denver District Court alleging breach of her original employment contract. The parties ultimately settled the matter when Dr. Holmes agreed to dismiss the suit with prejudice in return for $18,390 in damages. As part of the settlement, she signed a full release and settlement agreement waiving any further claims against the University with regard to her removal as Chairperson.

Nevertheless, on May 30, 1997, Dr. Holmes again filed suit in Denver District Court against the University, this time alleging employment

discrimination under Title VII, the ADEA, 42 U.S.C. § 1983, and the Equal Pay Act, 29 U.S.C. § 206. In her complaint, she asserted both disparate treatment and hostile work environment claims. Some of the instances of alleged discriminatory conduct by University officials and employees Dr. Holmes cited to support her claims include:

1. The University administration's failure to timely complete her paperwork for health insurance and other benefits when she started her employment.

2. A colleague's distribution of a draft memo describing the credentials of people within the the Communications Department which referred to Dr. Holmes as "an African-American woman" and did not – in Dr. Holmes' opinion – sufficiently describe her qualifications.

3. Alleged statements by colleagues and supervisors Dr. Holmes says she overheard and her own impression that the University was recommending her reappointment with the understanding she would retire before achieving tenure.

4. A colleague's self-deprecating comments about his own age, which Dr. Holmes interpreted to be directed at her.

5. Individuals at the University purportedly looking "askance" at Dr. Holmes in reaction to her race.

6. The University's payment of a higher salary to two other allegedly

"similarly situated" white male faculty members in other departments.

7. The University's refusal to grant Dr. Holmes tenure after her third-year review.

8. The University's failure to fully advise her of all the "problems" in the Communications Department before she was hired.

9. Alleged statements by colleagues implying that Dr. Holmes received her position and other privileges because she was an "affirmative action hire."

10. An incident where Dr. Holmes found the plaque containing the University's affirmative action policy had inexplicably fallen or been knocked off the wall of her office and broken.

11. The department Chairperson giving what Dr. Holmes felt was insufficiently positive support for her reappointment.

12. The University's failure to make sufficient expression of condolences after Dr. Holmes' daughter died.

13. A supervisor's failure to notify Dr. Holmes of her option to delay her tenure clock with regard to her fifth-year review in 1996.

14. A supervisor's characterization of the fifth-year tenure process as mandatory, even though other white male professors were not subject to the review.

15. Allegedly inappropriate race-related questions Dr. Holmes overheard a

colleague asking a student during a masters thesis defense.

16. Her removal as Chairperson of the department in 1993.

After removing the case to the United States District Court for the District of Colorado based on the federal questions presented, the University filed a motion for summary judgment arguing: (1) relevant statutes of limitations bar consideration of certain instances of conduct used to support Dr. Holmes' Title VII, ADEA, and § 1983 claims; (2) principles of *res judicata* and the binding effect of the previously executed release and settlement agreement restrict the court's consideration of certain allegations Dr. Holmes made; (3) without evidence of gender discrimination, Dr. Holmes' has no claim for relief under the Equal Pay Act; and (4) her remaining, timely instances of alleged discrimination fail to state a cognizable claim for race or age discrimination under any circumstances. In response to the University's motion, Dr. Holmes waived her Equal Pay Act claim, but argued the continuing violation doctrine tolled the relevant statutes of limitation and preserved her otherwise untimely claims of age and race discrimination. In addition, she asserted *res judicata* and the prior settlement agreement only barred relitigation of her contract claim, not an action for discrimination based in part on her removal as Chairperson. Finally, she claimed her evidence of alleged race and age discrimination created fact issues

which were more than sufficient to survive the University's motion for summary judgment.

The district court ultimately granted summary judgment in favor of the University. In its order, the district court ruled Dr. Holmes had no claim under the Equal Pay Act and refused to consider her removal as Chairperson as evidence of a pattern and practice of race or age discrimination, finding her claim barred by principles of *res judicata*. The district court also decided many of the instances of alleged discriminatory conduct could not support Dr. Holmes' claims because they fell beyond the relevant limitation periods for Title VII, the ADEA, and 42 U.S.C. § 1983. Finally, the court found the remaining instances of conduct insufficient to create genuine issues of material fact.

## II. Discussion

Dr. Holmes raises several issues for our consideration. First, whether the court erred in its decision by resolving material questions of fact regarding her claims. Second, whether the district court inappropriately applied *res judicata* to bar consideration of her removal as Chairperson of the Communications Department in 1993 as evidence of a pattern and practice of discrimination. Third, whether the court incorrectly interpreted the settlement and release

executed by the parties in 1996.  Fourth, whether the district court appropriately refused to apply the "continuing violations doctrine" to toll the statute of limitations with regard to her Title VII, ADEA, and 42 U.S.C. § 1983 claims. And finally, whether the court erred in holding the instances of alleged discriminatory conduct failed to state a claim of race or age discrimination.

We review the district court's order granting summary judgment *de novo,* employing the same legal principles as the district court and construing the factual record and the reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *See Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998).  Summary judgment is appropriate if the record shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c). An issue of material fact is genuine only if a party presents facts sufficient to show that a reasonable jury could find in favor of the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). [1]

---

[1]  We note at the outset, that because motions for summary judgment necessarily implicate "'the substantive evidentiary standard of proof that would apply at the trial on the merits,'" *Public Serv. Co. v. Continental Cas. Co.*, 26 F.3d 1508, 1517 n.8 (10th Cir. 1994) (quoting *Liberty Lobby*, 477 U.S. at 252), the content and substance of evidence Dr. Holmes presents to support her claims must be both admissible and probative.  *See Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir.1995) (ruling the court may only consider admissible evidence in reviewing an order granting summary judgment); *Liberty Lobby*,

A.    Timeliness of Claims – Effect of the Statute of Limitations

Dr. Holmes argues the continuing violation doctrine applies to save her claims, which are based on instances of allegedly discriminatory conduct occurring beyond the limitations periods under Title VII, the ADEA, and 42 U.S.C. § 1983. [2] After a thorough review of the record and applicable law, we are convinced the court properly considered Dr. Holmes' allegations time-barred, and refused to accept her argument that the "continuing violation theory" tolled the limitations period and preserved her claims.

This court has held "[t]he continuing violation doctrine permits a Title VII plaintiff to challenge incidents that occurred outside the statutory time limitations of Title VII if such incidents are sufficiently related and thereby constitute a

---

477 U.S. at 249-50 (finding summary judgment evidence must be not merely "colorable," but "significantly probative"). We review Dr. Holmes' claims with these standards governing our analysis of her proffered evidence of discrimination.

[2] This court has never specifically held whether the continuing violation theory applies to claims brought under 42 U.S.C. § 1983, *see Hunt v. Bennett*, 17 F.3d 1263, 1266 (10th Cir.1994). Analogous cases indicate it may not. For example, in *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1514 (10th Cir. 1997), we acknowledged in the context of a 42 U.S.C. § 1981 action that "the continuing violation theory is a creature of the need to file administrative charges, and because [this type of] claim does not require filing such charges before a judicial action may be brought, the continuing violation theory is simply not applicable." 111 F.3d at 1514. Nevertheless, because we find the continuing violation theory inapplicable to the facts of this case, we need not reach the question of whether it tolls the limitation period in the § 1983 context.

continuing pattern of discrimination." *Hunt v. Bennett*, 17 F.3d 1263, 1266 (10th Cir.), *cert. denied*, 513 U.S. 832 (1994). The doctrine "is premised on the equitable notion that the statute of limitations should not begin to run until a reasonable person would be aware that his or her rights have been violated." *Martin v. Nannie & The Newborns, Inc.*, 3 F.3d 1410, 1415 n.6 (10th Cir.1993). For purposes of determining whether a continuing violation has occurred, we examine: (1) the subject matter of the prior violation to determine whether it constitutes the same or similar type of discrimination; (2) the frequency of the conduct; and (3) permanence – *i.e.*, "whether the nature of the violations should trigger an employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate." *Martin*, 3 F.3d at 1415. The court in *Martin* specifically noted that "if an event or series of events should have alerted a reasonable person to act to assert his or her rights at the time of the violation, the victim cannot later rely on the continuing violation doctrine to overcome the statutory requirement of filing a charge with the EEOC with respect to that event or series of events." *Id.* at 1415 n.6.

In this case, we find Dr. Holmes' arguments fail the *Martin* test. Although the subject matter of her alleged instances of discrimination does not vary, the

occurrences are relatively infrequent when compared to the length of time addressed in her complaint. The occurrences Dr. Holmes mentions are sporadic and varying types of employer actions, not frequently recurring instances of similar race or age-related discriminatory conduct. In addition, the "permanent" nature of the violations she alleges plainly should have triggered her awareness of the need to assert her rights. Dr. Holmes specifically admitted she was convinced the University was discriminating against her as early as March 1993, but she did nothing to assert her rights at that time. [3] Given these facts, and the equitable underpinnings of the continuing violation theory, we are reluctant to invoke the doctrine to benefit someone who knew or reasonably should known her rights were being violated and yet did not act in a timely manner to assert

---

[3] Dr. Holmes argues that her awareness of the University's alleged discrimination as early as March 1993 does not preclude the application of the continuing violation theory to preserve her claims. For support, she points to our holding in *Martin*, where the court applied the continuing violation theory to allow a plaintiff to raise otherwise untimely evidence of sexual harassment – including an alleged rape – even though the plaintiff obviously knew the conduct was discriminatory at the time the events occurred. *See Martin*, 3 F.3d at 1416. We distinguish *Martin*, by emphasizing that the court based its decision to apply the continuing violation theory almost exclusively on the first two factors of subject matter and frequency, and specifically admitted "[t]he third factor of permanence is more difficult for [the plaintiff]" because "some of the events, including the rape, should have been reported at the time they occurred." *See id.* Indeed, the court in *Martin* acknowledged that no one factor is necessarily dispositive, but courts should consider the factors together to decide whether to apply the continuing violation theory. *Id.* at 1415-16. In Dr. Holmes' case, viewing the factors collectively, we find the scales weigh against applying the continuing violation theory because her claims fail both the frequency and permanence prongs.

those rights. Because the alleged conduct was infrequent, and Dr. Holmes knew of the discrimination years ago and yet did nothing about it, we decline to apply the continuing violation theory to preserve her claims. [4]

We agree with the district court that for purposes of both Title VII and the ADEA, only conduct occurring within 300 days before Dr. Holmes' filed her claim with the Colorado Civil Rights Division is timely. *See* 42 U.S.C. § 2000e-5(e)(1) (requiring person aggrieved to file within 300 days of the alleged unlawful employment practice, if proceedings were initially instituted with state agency with authority to grant or seek relief). Because Dr. Holmes filed charges on June 11, 1996, we will not consider instances of alleged discriminatory conduct occurring before August 16, 1995. As for Dr. Holmes' 42 U.S.C. § 1983 claim, because no federal law provides a period of limitation, we must "apply the relevant state statute of limitations applicable to such actions." *Hunt*, 17 F.3d at 1265. In Colorado, a two-year statute of limitations applies to "actions upon liability created by a federal statute." *See* Colo. Rev. Stat. § 13-80-102(1)(g).

---

[4] As an alternative to this usual approach, plaintiffs may prove a continuing violation "with evidence of a pervasive, institutionalized system of discrimination . . . which typically involves discrimination through an employer's policies or practices." *Purrington v. University of Utah*, 996 F.2d 1025, 1029 (10th Cir.1993) (quotation marks and citation omitted). Dr. Holmes does not pursue this approach or present any evidence remotely indicating a university-wide system of discrimination.

Therefore, because Dr. Holmes initiated this present suit in state court on June 4, 1997, we only consider timely those incidents occurring after June 4, 1995.

B.      Effect of *Res Judicata* and Prior Settlement Agreement

Although the parties addressed the effect of *res judicata* and the prior settlement agreement at length in their pleadings before the district court and before us on appeal, we find it unnecessary to rule on these issues. Dr. Holmes' removal as Chairperson occurred in 1993, well beyond the relevant limitations period under either Title VII, the ADEA, or 42 U.S.C. § 1983. We already have declined to apply the continuing-claim theory to consider claims based on alleged instances of discriminatory conduct occurring beyond the relevant statute of limitations period, thus we need not concern ourselves with the untimely allegations surrounding Dr. Holmes removal as Chairperson or the effect *res judicata* and the release and settlement may have on those claims.

C.      Sufficiency of Remaining Claims

Having limited the scope of our evidentiary review to only those instances of conduct occurring within the relevant limitation periods, we must now consider the remaining evidence of discrimination to determine whether it creates a genuine issue of material fact sufficient to survive a motion for summary

judgment. We assume, based on the evidence presented, that for purposes of her Title VII and the ADEA claims, Dr. Holmes asserts both a hostile work environment and disparate treatment. Upon review of the record, we find no triable issue of fact under any of her legal theories.

1.     Disparate Treatment

In order to to survive a motion for summary judgment with regard to her claim of disparate treatment under Title VII and the ADEA, Dr. Holmes must meet the initial burden of establishing the *prima facie* case articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). She must show: (1) she is a member of a racial minority or protected age group, (2) she suffered an adverse employment action, and (3) similarly situated employees were treated differently. *See Trujillo v. University of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998) (modifying the usual *McDonnell Douglas prima facie* case to fit the context of a disparate treatment claim). Once she establishes a *prima facie* case of age or race discrimination, the burden of production shifts to the University to demonstrate some "legitimate, nondiscriminatory reason" for the adverse employment action. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). If the University offers a nondiscriminatory reason for its decision, then the burden shifts back to Dr. Holmes to show there

-14-

remains a genuine dispute of material fact as to whether the University's reason

for the challenged action is pretextual and unworthy of belief. *See Burdine*, 450

U.S. at 256; *Ingels v. Thiokol Corp*., 42 F.3d 616, 622 (10th Cir.1994).

Ultimately, under this burden-shifting scheme, the University is entitled to

summary judgment if Dr. Holmes cannot "offer evidence tending to show [the

University's] innocent explanation for [its] employment decision was false."

*Randle v. City of Aurora*, 69 F.3d 441, 451 n. 14 (10th Cir. 1995).

Considering only timely allegations of discrimination under the relevant

statute of limitations for Title VII and the ADEA, we find the only viable

instance of conduct cited by Dr. Holmes that may support an inference of

discrimination is the salary disparity between her and other professors at the

University and the comprehensive fifth year review that University administrators

allegedly told Dr. Holmes was mandatory when, in fact, other white male

professors were "rubber-stamped through the process" with "extensive

departmental support and guidance." The other instances of conduct Dr. Holmes

refers to are either untimely or relevant only to her hostile work environment

claim. [5]

---

[5] For the first time on appeal, Dr. Holmes raises the University's decision not to renew her contract past the 1998-1999 school year as further evidence of discrimination. However, because the district court did not contemplate her termination in granting

In support of her disparate treatment claim before the district court, Dr. Holmes alleges the University paid her less than other younger, non-African-American, similarly situated professors. However, the record shows she did not make the *prima facie* case necessary to support her claim and shift the burden to the University. Her allegations are undermined from the start by the undisputed fact that she was the highest paid member of the Communications Department faculty during her employment with the University, and that she made more money than other more experienced colleagues – including white males. In addition, Dr. Holmes relies solely on her own unsupported conclusions about salary differences between her and professors in other departments and fails to demonstrate how they are "similarly situated" in terms of experience, credentials and accomplishments. Absent some evidence that the other, higher-paid professors are similarly situated, her allegations relating to compensation fail to show even a *prima facie* case of disparate treatment either on the basis of race or

---

summary judgment, we cannot consider this evidence in reviewing the court's ruling. *See John Hancock Mut. Life Ins. Co. v. Weisman*, 27 F.3d 500, 506 (10th Cir. 1994) (refusing, in the context of ruling on summary judgment, to consider evidence not part of the record before the district court). Even if we could consider Dr. Holmes' termination as possible further evidence of discrimination, we have no record to review for the purpose of accurately determining if the decision was, in fact, motivated by improper discriminatory intent, nor has the University had opportunity to explain or refute this new evidence. For all of these reasons, we decline to consider the evidence for the first time on appeal as requested by Dr. Holmes.

age sufficient to shift the burden of production to the University. *See Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994) (refusing to infer disparate treatment in a Title VII case until the plaintiff showed the employees treated more favorably are "similarly-situated" in "all of the relevant aspects of his employment situation").

As for Dr. Holmes' arguments pertaining to the comprehensive fifth year review, we find her allegations of disparate treatment similarly unavailing. She fails to state a *prima facie* case because she produces no evidence to support her conclusory allegations that white male professors in her department received better treatment from the University during their fifth year reviews. In fact, Dr. Holmes has not shown she actually suffered an adverse employment action or that the University treated her differently in relation to other similarly-situated professors. The University ultimately granted her request to delay her review, so we have no indication that Dr. Holmes was ever subject to a fifth year review or whether that review was different or unfair when compared with her colleagues' treatment. Without more compelling support for her claim, we find she fails to make her *prima facie* case. Accordingly, we find the district court properly granted summary judgment on all Dr. Holmes' disparate treatment claims.

2.    Hostile Work Environment

The vast majority of the evidence Dr. Holmes presents relates to her hostile work environment claim.  In order to establish a claim of race or age-related hostile working environment under Title VII and the ADEA [6] sufficient to survive a motion for summary judgment, Dr. Holmes must show under the totality of the circumstances that the harassment was pervasive or severe enough to alter the terms, conditions, or privileges of employment, and the harassment stemmed from race or age-related animus.  *See Bolden v. PRC Inc.*, 43 F.3d 545, 550-51 (10th Cir. 1994) (citing *Meritor*, 477 U.S. at 67), *cert. denied*, 516 U.S. 826 (1995). For purposes of evaluating whether a working environment is sufficiently hostile or abusive, we examine:  (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance.  *See Harris v.*

---

[6] Courts have long recognized that hostile environment claims are actionable under title VII based on race, *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65-66 (1986), but the issue of whether a plaintiff may proceed utilizing a hostile environment theory under the ADEA remains unsettled.  Although this circuit has not expressly recognized a cause of action for hostile work environment under the ADEA, it has considered a case where the plaintiff raised the issue. *See McKnight v. Kimberly Clark Corp*., 149 F.3d 1125, 1129 (10th Cir. 1998) (considering and deciding a hostile work environment claim under the ADEA, but not addressing the apparent lack of authority for raising such a theory). For purposes of this case, we assume without deciding Dr. Holmes may advance a hostile work environment claim under the ADEA.

*Forklift Sys., Inc.* 510 U.S. 17, 23 (1993). In addition, we analyze the claims to ensure the environment was both subjectively and objectively hostile or abusive. *See Davis v. United States Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998).

Applying these principles, we find Dr. Holmes' allegations fall far short of showing pervasive or severe harassment in terms of race or age discrimination. *See Bolden*, 43 F.3d at 551. The evidence Dr. Holmes proffers is nothing more than a collection of unsubstantiated conclusions and allegations of a series of unrelated and infrequent incidents of conduct by colleagues and supervisors she subjectively construes as acts motivated by race or age-related animus. Her "list of grievances includes none of the racial [or age-related] comments or ridicule that are hallmarks of hostile work environment claims." *Trujillo*, 157 F.3d at 1214. For example, Dr. Holmes' claims of overhearing conversations regarding the possibility of her imminent retirement, and a colleague's self-deprecating comments about his own age in her presence are hardly the type of age-discriminatory conduct that meets the threshold requirements for surviving summary judgment. In addition, Dr. Holmes' evidence of offhand race-related remarks by colleagues, the University failing to give sufficient condolences on the death of her daughter, or other employees looking "askance" at her – without further evidence that such conduct was motivated by racial animus – fails to

-19-

create a genuine issue of material fact as to whether her working environment was permeated by severe and pervasive harassment. At the very worst, Dr. Holmes' allegations show she suffered from conduct by co-workers and supervisors reflecting insensitivity toward her age and race, but none of her claims evidence the severe, pervasive, and frequent discrimination that is required to prove a hostile or abusive work environment. *See Meritor*, 477 U.S. at 65; *Smith v. Northwest Fin. Acceptance, Inc*., 129 F.3d 1408, 1412 (10th Cir. 1997) (explaining the mere utterance of a statement creating offensive feelings in an employee does not sufficiently affect the conditions of employment to violate Title VII); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1412-13 (10th Cir. 1987) (requiring evidence of "a steady barrage of opprobrious racial comment, " to show a racially hostile work environment.).

In addition, we emphasize that our federal employment laws are not intended to remedy every instance of interpersonal conflict occurring in the workplace – only those motivated by improper discriminatory purposes. Admittedly, Dr. Holmes probably endured unhappiness with her job and perhaps even suffered the ill-effects of rumors, petty quarrels, and jealous in-fighting with supervisors and colleagues. However, this evidence alone indicates nothing more than an unpleasant workplace created by the inability of co-workers to

respect, tolerate and cooperate with one another. No matter how unpleasant Dr. Holmes finds such a situation, unless she shows it is charged with race or age-related animus, her case simply does not rise to the level of creating a legally redressable hostile work environment claim. In short, after a thorough review of all Dr. Holmes' allegations, we find her claims legally insufficient to create a jury question and survive summary judgment. *See, e.g., Pagano v. Frank*, 983 F.2d 343, 347 (1st Cir. 1993) (finding that even when elusive concepts like motive or intent are in play, summary judgment may be appropriate if nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation).[7]

### 3. 42 U.S.C. § 1983

Dr. Holmes also includes a claim under 42 U.S.C. § 1983 in her original complaint. Section 1983 prohibits any person, acting under color of state law, from depriving any other person of any rights, privileges, or immunities secured by the Constitution and laws of the United States. *See* 42 U.S.C. § 1983.

---

[7] Although we do not specifically enumerate and individually address every allegation of discrimination Dr. Holmes raised, that is not to say we did not consider each event and review them under the totality of the circumstances to arrive at our decision. We simply find it expedient to summarize our conclusion that none of the incidents individually or taken as a whole reasonably suggest the pattern and practice of discrimination Dr. Holmes asserts.

Generally speaking, instances of race discrimination and possibly age discrimination may violate the Fourteenth Amendment right to equal protection of the laws and trigger a § 1983 claim. *See Buckley v. Coyle Pub. Schl. Sys.*, 476 F.2d 92, 97 (10th Cir. 1973) (finding racially discriminatory practices violate the Fourteenth Amendment and civil rights statutes). It appears from Dr. Holmes' pleadings and brief on appeal that she relies on exactly the same conduct and allegations giving rise to her Title VII and ADEA claims to support her § 1983 cause of action. We reiterate that most of these instances of alleged discrimination occurred beyond the limitations period applicable to 42 U.S.C. § 1983, and therfore we refuse to consider them. However, with regard to Dr. Holmes' timely allegations, for substantially the same reasons as articluated above, *see Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991) (stating a claim of intentional discrimination under 42 U.S.C. § 1983 is subject to the same methods of proof as an analogous claim under Title VII), we find she raises no genuine issue of material fact as to whether the University's alleged harassment amounted to intentional discrimination. The district court appropriately granted summary judgment on her § 1983 constitutional claim.

III. Conclusion

We find upon *de novo* review of the evidence presented that Dr. Holmes'

claims are either untimely or insufficient to create a genuine issue of material fact.  Thus, for the reasons stated above, we **AFFIRM** the decision of the district court.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge