996 F.2d 1025
 62 Fair Empl.Prac.Cas. (BNA) 354,
62 Empl. Prac. Dec. P 42,517, 84 Ed. Law Rep. 81,
37 Fed. R. Evid. Serv. 1169
 Beverly T. PURRINGTON, Plaintiff-Appellant,
v.
UNIVERSITY OF UTAH, Chase N. Peterson, James L. Clayton, Kay
M. Coleman, Ramona Adams, Shauna Adix, in their
representative capacities; Shauna Adix,
individually, Defendants-Appellees.
 No. 91-4219.
 United States Court of Appeals,
Tenth Circuit.
 June 21, 1993.
 
 Elizabeth T. Dunning of Watkiss, Dunning & Watkiss, Salt Lake City, UT, for plaintiff-appellant.
 Lois A. Baar (Francis M. Wikstrom and W. Mark Gavre of Parsons, Behle & Latimer, and Janet Hugie Smith of Ray, Quinney & Nebeker, attorney for Shauna Adix, with her on the brief), Salt Lake City, UT, for defendants-appellees.
 Before TACHA and BARRETT, Circuit Judges, and BROWN*, District Judge.
 BARRETT, Senior Circuit Judge.
 
 
 1
 In September, 1985, Beverly T. Purrington (Purrington) was hired by the University of Utah as the Program Coordinator at the Women's Resource Center (WRC), at which time Shauna Adix (Adix) served as the WRC Director. In March, 1986, Purrington contends that Adix began sexually harassing her. The harassment consisted of Adix frequently touching Purrington; pressing her body, namely her breasts, against Purrington; trapping Purrington in corners and against walls and obstructing passageways so that Purrington could not get by; standing close to and putting her arm around Purrington; and making sexually suggestive gestures and lewd and inappropriate sexual comments to Purrington and other women. (R., Appellant's Appendix, Vol. 1 at 371-73, 543-48).
 
 
 2
 Purrington objected, both orally and in writing, to Adix about this conduct. (R., Appellant's Appendix, Vol. 2 at 548, 562, 694, 918-20). Purrington also discussed the problem with others, including Kaye Coleman, Director of the University Office of Equal Opportunity (OEO); Norman Gibbons, Dean of Student Affairs and Services; Afesa Adams, Adix' immediate supervisor and University Associate Vice President; and James Clayton, University Provost. (R., Appellant's Appendix, Vol. 1 at 371-73; Vol. 2 at 536-39, 554-58, 628-30, 873, 918).
 
 
 3
 Adix left the WRC on May 31, 1988, to begin work at the School of Social Work. Purrington had no direct physical or interpersonal contact with Adix after that date. Following Adix' departure from WRC, Purrington cites two incidents as constituting part of a continuing sexual harassment in violation of Title VII. At the School of Social Work in the spring of 1989, Purrington witnessed Adix place her arm around a woman in a manner which Purrington found inappropriate. Second, Purrington was informed by a former WRC staff member that in the summer of 1989, Adix hugged the former staff member who was annoyed by such contact. Purrington did not witness this occurrence.
 
 
 4
 Purrington filed this action alleging sexual harassment through a hostile work environment and retaliation, both in violation of Title VII, Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. The district court granted summary judgment to all defendants on Purrington's hostile work environment claim, as the claim was untimely. The retaliation claim was tried to the court which ruled that Purrington failed to prove retaliation by any defendant.
 
 
 5
 On appeal, Purrington contends that the district court erred in: (1) granting summary judgment dismissing as untimely Purrington's hostile work environment claim, (2) refusing to shift the burden of proof to defendants on the retaliation claim, in accord with Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), (3) requiring that Purrington prove intent rather than causation on her retaliation claim, and (4) excluding testimony proffered by Purrington.
 
 
 6
 I. Timeliness of Hostile Work Environment Claim
 
 
 7
 The district court granted summary judgment dismissing Purrington's hostile work environment claim as untimely. This court reviews a grant of summary judgment de novo. "We apply the same legal standard used by the district court under Fed.R.Civ.P. 56(c) and examine the record to determine if any genuine issue of material fact was in dispute; if not, we determine if the substantive law was correctly applied." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir.1990).
 
 
 8
 In Utah, a plaintiff must file a Title VII discrimination charge within 240 days of the alleged discriminatory act.[1] Purrington filed her charge on July 28, 1989. Thus, her claim is timely only with respect to discriminatory acts which occurred after November 30, 1988. The district court held that because Adix neither touched nor made comments to Purrington once Adix left the WRC on May 31, 1988, no hostile work environment existed after that date. Therefore, for Purrington's untimely claim of sexual harassment to survive, she must either prove that a continuing violation existed or establish equitable tolling.
 
 A. Continuing Violation
 
 9
 "[A] hostile environment claim usually involves a continuing violation." Waltman v. International Paper Co., 875 F.2d 468, 476 (5th Cir.1989). To invoke the continuing violation exception to the Title VII charge-filing deadlines, Purrington must show either (1) a series of related acts taken against a single individual, one or more of which falls within the limitations period, or (2) the maintenance of a company-wide policy of discrimination both before and during the limitations period. Bruno v. Western Elec. Co., 829 F.2d 957, 961 (10th Cir.1987).
 
 
 10
 (1) Series of Related Acts
 
 
 11
 To prove a series of related acts, Purrington must show that the acts rise to the level of a "dogged pattern" of discrimination as distinguished from "isolated and sporadic outbreaks." Id. The evidence must "support[ ] a determination that the 'alleged discriminatory acts are related closely enough to constitute a continuing violation.' " Id. (citing Berry v. Board of Supervisors of L.S.U., 715 F.2d 971, 981 (5th Cir.1983)). "Courts have not formulated a clear standard for determining when alleged discriminatory acts are related closely enough to constitute a continuing violation and when they are merely discrete, isolated, and completed acts which must be regarded as individual violations." Berry, 715 F.2d at 981. The Berry court found three inquiries relevant, though not exhaustive: (1) whether the alleged acts involve the same type of violation, (2) whether the acts are recurring versus isolated; and perhaps most important, (3) whether the acts have the degree of permanence which should alert the employee to the duty to assert her rights. Id. Permanency depends on what the plaintiff knew or should have known at the time of the violation. In noting that acts of harassment which create a hostile environment generally have a lesser degree of permanence, the Fifth Circuit provided as an example that, "[i]f the person harassing a plaintiff leaves his job, the harassment ends...." Waltman, 875 F.2d at 476.
 
 
 12
 While Purrington asserted that she saw Adix engaged in inappropriate behavior on several occasions following Adix' departure from the WRC, only two incidents were identified with sufficient specificity and thereby referenced by the district court:
 
 
 13
 In the spring of 1989, while at the School of Social Work Building on WRC business, plaintiff witnessed Adix place her arm around a woman in a manner similar to the way Adix touched women at the WRC.
 
 
 14
 In the summer of 1989, while serving as a facilitator during a workshop at the Graduate School of Social Work, Adix hugged a former WRC staff member in a way the former staff member believed was sexual in nature. Plaintiff did not witness this event; rather, she was told about it by the former staff member.
 
 
 15
 (R., Appellant's Appendix, Vol. 1 at 258-59).
 
 
 16
 The district court held that the two incidents were too sporadic to constitute a hostile work environment and were removed from Purrington's work place, which the court limited to the WRC.
 
 
 17
 "[O]ne of the critical inquiries in a hostile environment claim must be the environment. Evidence of a general work atmosphere therefore--as well as evidence of specific hostility directed toward the plaintiff--is an important factor in evaluating the claim." Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir.1987). "[I]ncidents involving employees other than the plaintiff are relevant in establishing a generally hostile work environment." Id. at 1416.
 
 
 18
 While we recognize that the two incidents occurring after May 31, 1988 are relevant in establishing a hostile work environment and that Purrington's workplace arguably extends beyond the WRC, we believe that the incidents in question are of an infrequent, isolated, and discrete nature. We agree with the Fifth Circuit Court's example that when "the person harassing a plaintiff leaves [her] job, the harassment ends...." Waltman, 875 F.2d at 476.
 
 
 19
 The district court indicated that "[o]bserving one act of alleged harassment, and hearing about another, both of which occurred about a year after the alleged harassment of plaintiff ceased, does not rise to the level of a 'dogged pattern' of discrimination." (R., Appellees' Supplemental Appendix at 35-36). We agree. The two incidents Purrington cites are not related closely enough to evidence a dogged pattern of discrimination and thereby constitute a continuing violation.
 
 
 20
 (2) Company-wide Policy of Discrimination
 
 
 21
 Alternatively, a continuing violation may be established with evidence of a "pervasive, institutionalized 'system' of discrimination," Elliott v. Sperry Rand Co., 79 F.R.D. 580, 585-86 (D.Minn.1978), which typically involves discrimination through an employer's policies or practices. "A refusal to rectify a discriminatory practice or a repetition of the practice itself can render the act a continuing violation of civil rights." Ligon v. Frito-Lay, Inc., 82 F.R.D. 42, 48 (N.D.Tex.1979); Marlowe v. Fisher Body, 489 F.2d 1057 (6th Cir.1973).
 
 
 22
 Purrington asserts that Adix' conduct and the University's knowing tolerance thereof clearly constitute a pattern and practice of ignoring sexual harassment. The testimony in this case indicates that in spring 1986, Purrington met with Coleman at the OEO to discuss her concerns over Adix' conduct. Purrington met with Coleman a second time to inform her that the offensive behavior was continuing, to which Coleman replied that several complaints had been brought to her attention, and Coleman acknowledged that she had witnessed the behavior herself. (R., Appellant's Appendix, Vol. 2 at 537, 539, 541). Purrington and Coleman met on a third occasion at which time Coleman indicated that there was a "file this thick" on Adix, that there had been "a lot of complaints about Shauna [Adix], and that the Review was a way to get at those complaints." Further, Coleman noted that Purrington's complaint alone was not enough, but "the volume of the complaints, the repeatedness, the length of time this had gone on," warranted an investigation. Id. at 551-52, 582. Terri Busche testified that when she worked at WRC, she reported her concerns about Adix' conduct to Coleman. Coleman responded to Busche that if that information got out, it would be bad publicity for the WRC and the University. Id. at 630-31.
 
 
 23
 In early 1987, Purrington and others completed questionnaires in conjunction with a review of the WRC. In this Impact Assessment, Purrington registered her complaint about Adix' inappropriate and unwanted touching of staff, students and clients. Id. at 551, 563, 584. Other women registered similar complaints. Id. at 584.
 
 
 24
 Provost Clayton testified that the Impact Assessment and accompanying committee were not acceptable substitutes for an Administrative Review. He therefore required that the committee be disbanned and a new committee and review instituted. Id. at 868.
 
 
 25
 In early June, 1988, Purrington met with outside consultants, retained by the Administrative Review committee to undertake the second review. Purrington told them of the sexual harassment problems with Adix. Id. at 589. The Administrative Review committee received copies of the outside consultants' report, but Coleman shredded the copies once the committee finished reviewing them. Id. at 857.
 
 
 26
 In June, 1988, Purrington completed a self-study as part of the WRC review. Coleman informed Purrington, in accordance with the University attorney's request, that Purrington's comments regarding unwanted touching had to be removed from the self-study. Purrington was told that the Administrative Review committee would deal with the issue. Id. at 585. As a result, the self-study was redrafted, and the second draft did not contain comments regarding sexual harassment. Id. at 586-87.
 
 
 27
 Though the evidence in this case shows that several steps were taken in attempt to review the WRC, in recognizing the inadequacy of the Impact Assessment, University Provost Clayton took action thereon. A new committee was organized and a separate Administrative Review was instituted which involved investigation by two outside consultants. Upon completion of this review, it was suggested to Adix that she not teach the following year. Id. at 858. Purrington presented no evidence of a "pervasive, institutionalized system of discrimination."
 
 
 28
 We agree with the district court that Purrington failed to establish a continuing violation of Title VII which existed during and extended beyond the statutory limitations period. There was no evidence of either a series of related acts taken against Purrington or a company-wide policy of discrimination.
 
 B. Tolling the Statute of Limitations
 
 29
 The timely filing of a discriminatory charge may be equitably tolled. Irwin v. Veterans Admin., 498 U.S. 89, 94-95, 111 S.Ct. 453, 457, 112 L.Ed.2d 435 (1990). In this instance, the district court found that the principles of equity do not demand tolling of the statute of limitations. (R., Appellant's Appendix, Vol. 1 at 274). "[T]he 'application of equitable doctrines rests in the sound discretion of the district court; absent a showing of abuse of discretion, the district court's exercise thereof will not be disturbed on appeal.' " E.E.O.C. v. General Lines, Inc., 865 F.2d 1555, 1558 (10th Cir.1989) (citing McKinney v. Gannett Co., 817 F.2d 659, 670 (10th Cir.1987)).
 
 
 30
 The time limit for filing a discrimination charge may be equitably tolled "where a plaintiff has been 'lulled into inaction by her past employer, state or federal agencies or the courts.' " Martinez v. Orr, 738 F.2d 1107, 1110 (10th Cir.1984). Under Tenth Circuit law, Purrington must show that the University engaged in "active deception" which caused her filing to be untimely. Scheerer v. Rose State College, 950 F.2d 661, 665 (10th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 2995, 120 L.Ed.2d 872 (1992); Johnson v. United States Postal Serv., 861 F.2d 1475, 1481 (10th Cir.1988) ("In this circuit, a Title VII time limit will be tolled only if there has been 'active deception.' "), cert. denied, 493 U.S. 811, 110 S.Ct. 54, 107 L.Ed.2d 23 (1989); Martinez, 738 F.2d at 1110 (10th Cir.1984) ("[T]he time limits contained in Title VII will be tolled only where the circumstances of the case rise to the level of 'active deception' sufficient to invoke the powers of equity.").
 
 
 31
 Purrington contends that she and others were lulled into inaction by Coleman's statements. Having discussed Adix' inappropriate behavior with Coleman at least twice, Purrington believed that the University's review of the WRC would alleviate the problem. She testified that:
 
 
 32
 What Kaye [Coleman] said was there had been a lot of complaints about Shauna [Adix], and she knew about them. This was the point at which I think she talked to me about the file this thick on Shauna [Adix], and that the Review was a way to get at those complaints' and that my complaint was--my complaint was just not enough to do much about, but the--kind of the volume of the complaints, the repeatedness, the length of time this had gone on, that the University was concerned.
 
 
 33
 (R., Appellant's Appendix, Vol. 2 at 552).
 
 
 34
 Purrington contends that she "had the understanding by then that the Impact Assessment was going to look into this." Id. at 550.
 
 
 35
 A knowing plaintiff has an obligation to file promptly or lose her claim. Purrington testified that she believed she was a victim of sexual harassment. (R., Appellees' Supplemental Appendix at p. 10). Once Adix left the WRC, Purrington waited fourteen months to file her charge. Assuming arguendo that Coleman's statements to Purrington were actively deceptive by early 1988, Purrington was aware that her complaints and those of others were not being addressed by the Impact Assessment. (R., Appellant's Appendix, Vol. 1 at 260-61). By June 20, 1988, Purrington knew that her allegations were not being addressed by the self-study. (R., Appellant's Appendix, Vol. 2 at 1002). Had Purrington pursued formal action against Adix when she knew that neither the Impact Assessment nor the self-study were going to contain her allegations, or within a reasonable time thereafter, her claim of hostile work environment would have been timely.
 
 
 36
 As the district court in its discretion indicated, principles of equity and fairness do not warrant tolling when, as here, the plaintiff knowingly failed to act with due diligence. We affirm the district court's grant of summary judgment in that Purrington's claim of sexual harassment based on a hostile work environment is time barred and she failed to establish either a continuing violation or grounds for equitable tolling.
 
 II. Retaliation Claim
 
 37
 The district court found that the defendants did not unlawfully retaliate against Purrington in violation of Title VII by not selecting her as the new WRC director. The court's factual findings regarding retaliation may be reversed on appeal only if they are clearly erroneous. Anderson v. City of Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985); Colon-Sanchez v. Marsh, 733 F.2d 78, 81 (10th Cir.), cert. denied, 469 U.S. 855, 105 S.Ct. 181, 83 L.Ed.2d 115 (1984).
 
 
 38
 Purrington asserts that her complaints concerning Adix' sexual harassment created to some significant degree the conflict and tension surrounding the WRC. She claims that, in an attempt to select a new director for the WRC, the search committee decisionmakers held this conflict and tension against her in that (1) Purrington's association with the WRC was considered a "past cloud," and (2) Kathryn Brooks' (the woman ultimately hired as the new WRC director) lack of prior association with the WRC was considered a positive factor for her. Purrington contends that holding the conflict and tension against her in this manner is unlawfully retaliatory. Because this impermissible factor played a significant role in the committee members' decision, Purrington argues that she was entitled to have the burden of proof shifted to Defendants to prove that Brooks would have been selected even if the impermissible factor had not been considered. See Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).
 
 
 39
 In Price Waterhouse, the Supreme Court held that where there is direct evidence that "a decision was a product of a mixture of legitimate and illegitimate motives," and where the plaintiff proves that the discriminatory factor was a substantial motivating reason for the decision, the burden of persuasion shifts to the defendant to show that it would have made the same decision even in the absence of the discriminatory factor. Id. at 247, 259, 276, 109 S.Ct. at 1788, 1795, 1804.
 
 
 40
 Here, the district court found that Price Waterhouse did not apply because Purrington presented no direct evidence of retaliation, and she presented no evidence of mixed motives. (R., Appellees' Supplemental Appendix at 42-44). Furthermore, the district court found that an impermissible factor did not play a "motivating" or a "substantial" role in the committee members' decision.
 
 
 41
 [I]t was not a factor in the decision of any search committee member that Purrington be eliminated from the position of director of the WRC because she may have been a trouble maker and it was also not a factor in any of their decisions that she had or may have made allegations of sexual harassment against Adix.
 
 
 42
 * * * * * *
 
 
 43
 [T]he determination of that decision was not affected by Purrington's having engaged in protected activity or in her having made allegations of sexual harassment against Adix.
 
 
 44
 (R., Appellant's Appendix, Vol. 1 at 394-97).
 
 
 45
 Regardless, Purrington asserts that the testimony of three search committee members indicates that the conflict and tension were impermissibly held against her. Irene Fischer admitted that the search committee discussed the history of conflict and tension at the WRC (R., Appellant's Appendix, Vol. 2 at 767-70); Fischer's evaluation of Purrington indicated "Con--Past Cloud," id. at 1031; Fischer admitted that Purrington had complained to her about Adix standing too close and that either those complaints or the history of problems at the WRC cast the cloud over Purrington's application, id. at 771-75; and Fischer could not say that Purrington's complaints about Adix did not enter into her decision to choose Brooks over Purrington. Id. at 788-89. Karen Sheperd articulated that the sole negative factor concerning Purrington's application was the conflict at the WRC. Id. at 735. Finally, Jack Newell admitted that committee members acknowledged that "there were major conflicts" at the WRC, id. at 805; the committee found it important to look at candidates from outside the University who could provide a "new sense of direction" at the WRC, id. at 806; and in the search process, Newell asked Purrington how she had been a part of the conflict at the WRC, id. at 833. Furthermore, Newell called Adix for information concerning Purrington and thereafter reported the reference to the search committee. Id. at 825-32.
 
 
 46
 Notwithstanding this testimony, our review of the record convinces us that the district court's finding of no retaliation is not clearly erroneous. The district court found that the search committee was aware of conflicts and problems at the WRC which had nothing to do with alleged sexual harassment or Purrington's protected activity. For example, Irene Fischer testified that Purrington revealed to her many conflicts at the WRC involving WRC management, budgeting problems, and Adix' failure to implement programs which Purrington favored. (R., Appellees' Supplemental Appendix at 86, 87, 90). Newell testified that differences arose between Adix and Purrington over WRC policies and priorities. Id. at 95. Testimony revealed multiple sources of conflict involving Purrington, the WRC, and the University, none of which had anything to do with Purrington's protected activity.
 
 
 47
 We will not disturb the district court's findings of fact unless, following a review of the entire evidence, we are left with a definite and firm conviction that a mistake has been committed. Anderson, 470 U.S. at 573, 105 S.Ct. at 1511; United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); E.E.O.C. v. General Lines, Inc., 865 F.2d 1555, 1558 (10th Cir.1989). And, "[w]hen a case is tried to the district court, the resolution of conflicting evidence and the determination of credibility are matters particularly within the province of the trial judge who heard and observed the demeanor of the witnesses." Dowell v. United States, 553 F.2d 1233, 1235 (10th Cir.1977).
 
 
 48
 Purrington's case rests on the theory that the search committee members held against Purrington the conflict and tension which, at least to some significant degree, were a result of her protected activity. (R., Appellant's Appendix, Vol. 1 at 29). The district court did not find that the problems involving Purrington at the WRC were reducible to her protected activity.
 
 
 49
 While we acknowledge that this is a mixed motives case and that the district court's contrary ruling is erroneous, we hold that the court was not clearly erroneous in finding/concluding that Purrington's protected activity was not a substantial motivating reason for the decision to hire someone other than Purrington. Accordingly, the court correctly refused to shift the burden to Defendants, pursuant to as Price Waterhouse.
 
 III. Intent Versus Causation
 
 50
 To establish a prima facie case of retaliation, a plaintiff must show: (1) protected opposition to discrimination; (2) adverse action by an employer contemporaneous with or subsequent to the employee's protected activity; and (3) a causal connection between such activity and the employer's action. If a prima facie case is established, the burden of production shifts, and the defendant must articulate a legitimate, nondiscriminatory reason for the adverse action. "Once the defendant has dispelled the inference of retaliation by establishing a legitimate reason, 'the plaintiff may still prevail if she demonstrates the articulated reason was a mere pretext for discrimination.' " Anderson v. Phillips Petroleum Co., 861 F.2d 631, 634 (10th Cir.1988) (citing Burrus v. United Tel. Co. of Kansas, Inc., 683 F.2d 339, 343 (10th Cir.), cert. denied, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982)); see also Kenworthy v. Conoco, Inc., 979 F.2d 1462, 1469 (10th Cir.1992).
 
 
 51
 Purrington argues that the district court erroneously required that she prove intentional retaliation rather than mere causation as required under Anderson. In its Conclusions of Law, the district court indicated that Purrington was required to "prove by a preponderance of the evidence that defendants had a discriminatory or retaliatory intent or motive in taking adverse employment actions affecting [her and] that defendants had such discriminatory or retaliatory intent or motive against her because of her protected activity...." (R., Appellant's Appendix, Vol. 1 at 403). The court concluded that Purrington "failed to meet her burden of persuading the court that any retaliatory motive or discriminatory purpose of any defendant was a substantial, determinative factor in the decision by the members of [the] search committee or of any defendant to reject Purrington and select Brooks as the Director of the WRC." Id. at 404.
 
 
 52
 Reviewing this issue de novo, we hold that the district court did not misapprehend the elements of Purrington's retaliation claim. Under McDonnell Douglas, the plaintiff bears the "ultimate burden of proving intentional discrimination." MacDonald v. Eastern Wyo. Mental Health Ctr., 941 F.2d 1115, 1119 (10th Cir.1991); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 255-56, 101 S.Ct. 1089, 1094-95, 67 L.Ed.2d 207 (1981) ("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."). This court has further indicated that "[t]he causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." Burrus, 683 F.2d at 343. See also Grant v. Bethlehem Steel Corp., 622 F.2d 43, 46 (2d Cir.1980) (Plaintiff must show "a causal connection between the first two elements, that is, a retaliatory motive playing a part in the adverse employment actions.").
 
 
 53
 In MacDonald, 941 F.2d 1115, the district court granted summary judgment to defendant on plaintiffs' ADEA claim for failure to establish a prima facie case. However, "[t]he court required Plaintiffs to disprove the reasons given by Defendant for their discharge in order to establish a prima facie case." Id. at 1119. The district court's ruling
 
 
 54
 raises serious problems under the McDonnell Douglas analysis, which mandates a full and fair opportunity for a plaintiff to demonstrate pretext. Short-circuiting the analysis at the prima facie stage frustrates a plaintiff's ability to establish that the defendant's proffered reasons were pretextual and/or that age was the determining factor; if a plaintiff's failure to overcome the reasons offered by the defendant for discharge defeats the plaintiff's prima facie case, the court is then not required to consider plaintiff's evidence on these critical issues.
 
 
 55
 Id.
 
 
 56
 In his concurrence, Judge Seth stated that the appellate court "should start where the trial judge started, that is, with the whole evidence package...." Id. at 1122 (Seth, J., concurring).
 
 
 57
 When all the proof is in, again whether tried or heard on motion, the steps, the burdens of going forward, the sequence and whether a prima facie case was established, are history. The trial court is then faced only with an ultimate decision no matter how the basic issue got there. We are in the same position. Thus when all the evidence the parties wanted is in, at once an analysis by the McDonnell sequence has little meaning, and the prima facie threshold has little or no significance. Instead, the proceedings are then like all other summary judgment actions. Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant. The district court has before it all the evidence it needs to decide whether 'the defendant intentionally discriminated against the plaintiff.'
 
 
 58
 Id. (citing Burdine, 450 U.S. at 253, 101 S.Ct. at 1093).
 
 
 59
 In Kenworthy, 979 F.2d 1462, this court held that though the district court erred in its legal analysis by concluding that plaintiff failed to establish a prima facie case, such legal error was harmless as it appeared that the court actually performed the entire three-part McDonnell Douglas analysis and determined that the defendant's reasons were not pretextual. Id. at 1470. Citing MacDonald, 941 F.2d at 1120, the Kenworthy court reiterated that an employer's reasons for an adverse action are not appropriately brought as a challenge to the sufficiency of the plaintiff's prima facie case. "Rather the employer's evidence is properly considered in addressing whether those articulated reasons are legitimate or merely a pretext for discrimination." Kenworthy, 979 F.2d at 1470.
 
 
 60
 In this case, the trial court decided the ultimate issue based on all of the evidence before it. As such, "the prima facie threshold has little or no significance." MacDonald, 941 F.2d at 1122 (Seth, J., concurring). We hold that any error by the district court in stating that Purrington failed to meet her burden of persuading the court of a retaliatory motive is harmless. It is apparent that the court performed the three-part analysis, and, based on the entire evidence package, found that "the search committee members made their decision based upon the respective merits of the applicants ... [and] did not believe that the qualifications of Purrington were as impressive as those of Brooks...." (R., Appellant's Appendix, Vol. 1 at 393, 396). We affirm the district court's finding.
 
 IV. Excluded Statements
 
 61
 Purrington contends that the district court erroneously excluded testimony from two University professors concerning conversations they had had with other University personnel regarding Purrington. We review the trial court's evidentiary rulings for an abuse of discretion. Durtsche v. American Colloid Co., 958 F.2d 1007, 1011 (10th Cir.1992).
 
 
 62
 Purrington proffered the testimony of Dr. Peggy Pascoe who served on the Women's Studies Coordinating Committee with committee-chair Reagan. Pascoe was to testify regarding a statement by Reagan that Adix removed Purrington from the committee to punish Purrington. Purrington also offered testimony by Professor Larry Gerlach concerning statements of Jacque Morgan, University student body president, who had served on a search committee for a new athletic director. Morgan's statements, made to Gerlach who served on the same committee, concerned the fact that Adams had spoken out against Purrington's candidacy for the Lowell Bennion Center Directorship, the result of which was Purrington's nonselection.
 
 
 63
 Regarding Pascoe's proffered testimony upon objection in that the solicited statement called for hearsay, the district court indicated, "I don't see why that would be something that an agent of the University would be talking about ... I don't think here that's an 801(b)(2) statement by an agent of the University, at least not based on the foundation to date." (R., Appellant's Appendix, Vol. 2 at 907). The court refused admission, noting that "I don't think that's what's contemplated by the exception to the hearsay rule." Id. at 908.
 
 
 64
 We agree with the district court's rulings. Both statements offered constitute hearsay, and neither is a statement made by an agent of the University on a subject matter within the scope of the individual's agency or employment. Purrington failed to show that Reagan's alleged statement concerns a matter within the scope of her agency. Because Purrington's appointment to and removal from the committee was within Adix' authority, Reagan's statement about Adix' motives does not concern a matter within the scope of Reagan's agency. Morgans' alleged statement to Gerlach did not occur in relation to Morgan's role as a member of the Lowell Bennion Search Committee. At the time the statement was made, the search had been completed, and furthermore, the conversation did not occur pursuant to Morgan's or Gerlach's official or University capacities. The proffered testimony does not fit within the hearsay exception found at Rule 801(d)(2), and therefore, the court did not erroneously exclude the testimony from evidence.
 
 
 65
 We AFFIRM.
 
 
 
 *
 The Honorable Wesley E. Brown, Senior Judge, United States District Court for the District of Kansas, sitting by designation
 
 
 [1]
 Utah is a "deferral state" under Title VII because it has an administrative agency which investigates employment discrimination claims under a work-sharing arrangement with the EEOC. See Utah Code Ann. § 34-35-1 et seq