Viola Mae LAWYER, Plaintiff,

v.

ECK & ECK MACHINE CO., INC., Defendant.

No. 00–1144–WEB.

United States District Court, D. Kansas.

Jan. 28, 2002.

Mark G. Ayesh, Ayesh Law Offices, Wichita, KS, for plaintiff.

David M. Rapp, Sarah J. Loquist, Hinkle Elkouri Law Firm, L.L.C., Wichita, KS, for defendant.

### Memorandum and Order

BROWN, Senior District Judge.

Plaintiff Viola Mae Lawyer brought this action against her former employer, Eck & Eck Machine Company, claiming she was sexually harassed and discriminated against on account of pregnancy during her tenure with the company, in violation of federal employment discrimination law. Plaintiff also asserts several state law claims, including retaliation, negligent hiring, supervision and retention, and intentional infliction of emotional distress. The matter is now before the court on the defendant's motion for summary judgment. The court finds oral argument would not assist in deciding the issues presented.

### I. Facts.

In keeping with the standards governing summary judgment, any facts in the parties' briefs not properly supported by the record have not been included in the following statement of facts. Because it is the function of a jury to resolve conflicts in the evidence and to determine the credibility of witnesses, any matters as to which the record discloses a genuine dispute of fact have been construed in the plaintiffs' favor for purposes of determining whether the defendant is entitled to summary judgment.

### A. Stipulations from the Pretrial Order.

Plaintiff Viola Mae Lawyer is a citizen and resident of Wichita, Kansas, and was formerly an employee of defendant Eck & Eck Machine Co., Inc. Eck & Eck is a Kansas corporation with its principal offices located at 4606 West Harry, Wichita, Kansas. Plaintiff commenced her employment with defendant on January 7, 1998. Her employment ended on July 2, 1999. See Pretrial Order, Doc. 30 at p. 3, Stipulations A, B & C.

During plaintiff's employment, Eck & Eck did not have a printed sexual harassment policy in its handbook and did not provide special training to its workforce concerning sexual harassment; however, defendant did post the standard employment law posters which include information regarding the prohibition against sexual harassment. Id., D.

Randy Shrauner was plaintiff's supervisor except for the period of time from March 8, 1999, through April 7, 1999. Id., E.

While employed by Eck & Eck, plaintiff became pregnant and informed her supervisor, Randy Shrauner, of the pregnancy in person and informed Leon Black (Eck & Eck's General Manager) of the pregnancy by submitting a note from her treating physician indicating certain work restrictions. Id., F.

Neither Randy Shrauner nor any other supervisor at Eck & Eck ever asked plaintiff for any sexual favors. Id., G.

Paul and Bettie Eck, the owners of Eck & Eck, were always open and willing to talk to their employees if they had a problem. Leon Black, the General Manager, was always willing to talk to plaintiff about any problems that she might have. Id., H & I.

Plaintiff performed the same job with the same duties at the same pay and benefits for the same number of hours per week after she allegedly contacted the

Kansas Human Rights Commission. Id., J.

Plaintiff worked for three or four days after submitting a doctor's note with work restrictions before she left work to have a surgical procedure due to her miscarriage. Id., K.

Plaintiff does not assert that she was sexually harassed by any employee other than Randy Shrauner. Id., L. Randy Shrauner never laid a hand on plaintiff or pinched plaintiff.[1] Id., M.

B. Parties' Statements of Fact.

Eck & Eck is engaged in the business of manufacturing aircraft parts.

Plaintiff is a female born on 7/11/71. Prior to her employment with Eck & Eck, she had given birth to two children out of wedlock, Ariel and Raymond. Ariel was born October 10, 1991. Although it was not initially known whether Paul E. Johnson or Brent Lee Horsley was Ariel's father, a court determined that Horsley was the father. Plaintiff's second child, Raymond, was born April 23, 1993. Again, it was initially unknown whether Johnson or Horsley was the father. This time a court determined that Paul Johnson was the father. Plaintiff married Paul Johnson on September 9, 1995. They were divorced on May 12, 1997.[2]

Plaintiff attended North High School for two years but did not graduate. Prior to going to work for the defendant, plaintiff was on welfare and part of her hiring by the defendant was pursuant to the welfare-to-work program.

Plaintiff began her employment with Eck & Eck on January 7, 1998. Initially, she worked primarily as a delivery driver. The alleged sexual harassment did not begin until 2–5 months after plaintiff began her employment. Approximately 4–6 months after plaintiff began working for Eck & Eck, she took on the role of stock clerk/shipping clerk. Randy Shrauner was plaintiff's first line supervisor. Randy Shrauner's supervisor was Leon Black.

Randy Shrauner stated at work on several occasions, with regard to the plaintiff or other female co-workers, that he "wanted some of that" or he "would like a piece of her." Plaintiff and other employees heard these comments, which plaintiff believed were serious.

Dacia Pierce, a co-worker of plaintiff, advised plaintiff that she was tired of Randy Shrauner because he was "an asshole" and "a perverted male."

At least forty times during plaintiff's employment, Randy Shrauner called plaintiff a "skinny ass." He also referred to her on many occasions as "tit-less." According to plaintiff's testimony, Shrauner would regularly tell sexually-oriented jokes and make sexually-oriented gestures around plaintiff. Plaintiff heard him tell sexually-oriented jokes on a weekly basis. He would also regularly make comments about female employees to the effect that they had "nice tits" or a "nice ass." Ac-

1. The above stipulation appears in the Pretrial Order. Plaintiff now attempts to controvert it by stating that Shrauner "may have smacked her on the fanny" on one occasion. Inasmuch as the Pretrial Order controls the action, for purposes of summary judgment the court disregards plaintiff's attempt to controvert the stipulation.

2. The defendant's statement of facts includes numerous averments relating to plaintiff's personal life. Plaintiff's response indicates these allegations are uncontroverted, so the court has included them in the statement of facts. The court notes, however, that while such allegations might be relevant to potential jury issues such as damages or causation, they do not appear to be relevant to the issues raised in defendant's summary judgment motion.

cording to plaintiff, Shrauner would use "elevator eyes" to "look up and down" the female employees.

Shrauner spread rumors in the workplace about plaintiff's former husband being "hung like a horse." Plaintiff confronted Shrauner about making such comments, to which, according to plaintiff, Shrauner responded, "It's not like we're talking about your pussy, Viola." After plaintiff confronted Shrauner the rumors stopped.

On one occasion, plaintiff went to Shrauner's office to retrieve some index cards she needed to perform her duties. While she was there, Randy Shrauner asked her to look at some pictures. Most of the pictures were of Shrauner when he was younger, with numerous pictures of people on motorcycles. As they were going through the stack of pictures, they came across a photo depicting Shrauner's brother Rick (who was a machinist with Eck & Eck) naked and holding his penis over another man's face. Plaintiff walked out of the room. Shrauner just laughed at her. Plaintiff felt that Shrauner knew the picture was in the stack because he had just shown the pictures to someone else, and that he did this just to embarrass plaintiff.

On another occasion, plaintiff was invited into the office of Bernie Strecker, an Eck & Eck employee, and Strecker brought up a picture on his computer of a naked man and woman. Strecker asked plaintiff if her ex-husband "was hung like the guy in the picture." Plaintiff complained to Randy Shrauner about the incident. According to plaintiff, Shrauner responded as he had before: "It's not like we're talking about your pussy." When Paul Eck learned of the picture, he told Strecker to destroy it and informed him that he would be terminated if any such images were found on his computer again. Since then, Eck's son-in-law has periodical-

ly checked the computers for any such images and none have been found.

Randy Shrauner would sometimes pinch employees, both male and female, on the buttocks, although he never pinched plaintiff. On at least ten occasions, Shrauner would make kissing motions with his lips when plaintiff would walk by him.

Shrauner had tatoos on the inside of his upper and lower lips that read, respectively, "fuck me" and "fuck you." Shrauner would show plaintiff his tatoos. When he was in a bad mood, he would "flip[ ] his lip at me," which plaintiff took to mean "go away." On other occasions, Shrauner would comment to plaintiff on his favorite sexual positions and his penchant for fellatio, cunnilingus and anal intercourse.

On one occasion Randy Shrauner's brother, Rick, snapped a towel at plaintiff's rear end. This did not happen again after plaintiff asked Rick to stop it.

Dacia Piersall, a co-worker of plaintiff's, complained to plaintiff that Shrauner would look at her and talk about her breasts.

On at least seven or eight occasions, Randy Shrauner permitted plaintiff's co-worker Stephanie Hunsucker to rub her breasts against Shrauner. On occasion, Hunsucker talked in plaintiff's presence about giving "blow jobs" to Shrauner, and she would mimic having sex with shop tools and make crude comments about having sex with male employees in the workplace. She would regularly ask male co-workers to bend over and pick up a shop tool and would then comment on their "nice ass." According to plaintiff, Hunsucker and Randy Shrauner would sometimes make sexual gestures together. Plaintiff understood all of the foregoing to be intended in a joking manner, but she did not like it. When she complained to Shrauner about Hunsucker's behavior,

Shrauner said, according to plaintiff, that he was "not going to mess with this" and told plaintiff that she and Hunsucker needed to get along.

In total, plaintiff complained four times to Leon Black, the General Manager, about the sexually harassing conduct of Shrauner, and she complained on one occasion to the owner, Paul Eck. According to plaintiff, she complained about all of the foregoing episodes concerning Shrauner. Plaintiff also told Shrauner on numerous occasions that she did not appreciate his conduct. According to plaintiff, Eck & Eck did nothing to stop Shrauner's behavior.

Randy Shrauner quit his job on March 8, 1999, due to alleged time card improprieties. If he had not quit he would have been fired. After this, Shrauner telephoned the plaintiff at home and told her boyfriend, Ron Reimer, he was going to "kick his rear end" and wanted to meet somewhere to fight. According to plaintiff, Shrauner threatened them. Plaintiff complained to Leon Black about the threatening call before Eck & Eck rehired Shrauner. Around March or April of 1999, Ron Reimer expressed an interest in the shop foreman position formerly held by Shrauner. Leon Black did not promote Reimer to the position. Eck & Eck rehired Randy Shrauner on April 28, 1999.

At some point, plaintiff contacted the Kansas Human Rights Commission about her situation, and was advised to talk to Shrauner's supervisor about his conduct. Plaintiff told Paul Eck that she had made a complaint about sexual harassment.

After plaintiff had complained about Shrauner, according to plaintiff Shrauner came to her and said, "Don't fuck with me if you want to keep your job" and called her a "whore." Around the same time, Stephanie Hunsucker told plaintiff she should not have filed a sexual harassment complaint and that she should just "chill out" and "get over it." Plaintiff testified that after she complained, Shrauner showed up in her area more than usual and was mean to her and was "riding her butt."

Plaintiff became pregnant in 1998. Her doctor instructed her to avoid chemicals in the workplace and gave her written restrictions, including no lifting over ten pounds and avoiding chemicals, to take to Eck & Eck. Plaintiff's job sometimes included the handling of solvents such as ketone or "MEK." According to plaintiff, when Leon Black saw the restrictions he said, "What the hell is this?". When plaintiff explained that she was pregnant and these were restrictions from her doctor, Black said, "This shit ain't going to work" and told her to "get this restriction off or find another job." He said it wasn't his problem she was pregnant, it was hers. According to plaintiff, after she began crying Black told her to "go clean yourself up and get back to work." This incident occurred on or about November 3, 1998.

On November 6, 1998, plaintiff's medical records indicate "findings consistent with fetal demise" and "no fetal cardiac activity identified." On November 10, 1998, plaintiff requested time off from work for a surgical procedure due to a miscarriage. Plaintiff returned to work on or about November 17, 1998.

Plaintiff sought medical treatment for various ailments during the last few months of her employment. Plaintiff was suffering from hives, anxiety attacks, sleeplessness and eating disorders. She told her physician that she was nervous and was having problems at work.

On June 2, 1999, plaintiff's boyfriend (now husband) Ron Reimer was fired by Randy Shrauner for allegedly being disrespectful and disobedient.

On or about July 1, 1999, plaintiff asked Leon Black for permission to have Ron Reimer come to the plant and eat lunch with her. Black gave his permission. Randy Shrauner was not there at the time Reimer came by, but when he found out Reimer had been there he came over to plaintiff, screaming at her and cussing and saying Reimer was not supposed to be in the shop. When plaintiff told him Leon Black had given permission, Shrauner said, "I don't give a fuck what permission you had. He's not allowed in here. I don't want him in here and I'm tired of you getting your fucking way and your scrawny little ass is going to change. This shit is going to change around here." After Shrauner walked off, plaintiff went to Leon Black's office to complain about her treatment from Shrauner. Black called Shrauner into the office. When Shrauner came into the office he was angry and was screaming that plaintiff was spreading rumors about he and Stephanie Hunsucker having an affair and that his wife was ready "to come up and kick [plaintiff's] ass." Shrauner said he wasn't going to tolerate this and indicated he was going to get plaintiff "one way or another" and said, "There's two ways to skin a cat."

Plaintiff told Black that she had not spread rumors about Shrauner. Black responded by telling plaintiff to get the matter taken care of and to apologize to everyone around the shop. He then told plaintiff and Shrauner to get out of his office.

Plaintiff went around the shop and apologized to everyone for spreading a rumor, although she had not spread the rumor. When she apologized, some of the machinists told her they didn't know what she was talking about.

Plaintiff understood Shrauner's statement that he would "get her" to be a threat and she was scared. She felt she could not handle the stress any longer and she left the workplace for lunch.

According to her testimony, plaintiff never made sexually oriented comments to other employees and never told any sexually oriented jokes at work.

On July 2, 1999, plaintiff submitted a resignation letter to Eck & Eck. A typewritten portion of the letter indicated that she was quitting because of the accusations made by Randy Shrauner the day before and because in light of Shrauner's comments about there being "more than one way to skin a cat" it was apparent Shrauner didn't want her there and was "going to do anything in his power to get me fired." A handwritten portion of the letter signed by plaintiff and directed to Leon Black stated in part as follows:

> Thank you for taking the time to teach me and I enjoyed working with you. I know you [stuck] your neck out for me with Randy. Thanks. I didn't want it to be this way. I felt I had no other [choice]. I did come to you about a month ago and ask you to [become] my boss. I was trying to tell you something. I think people think that I'm not very smart, because I have [an] English and spelling problem. I'm a very smart woman. I did my best at my job. You know and I know that Randy is going to keep giving me a hard time. I couldn't take it any more. Thank you for all you have done. Take care.

The EEOC initially received plaintiff's charge of discrimination on October 22, 1999, more than three months after plaintiff resigned.

Plaintiff's attorney requested that the EEOC issue plaintiff a right-to-sue notice prior to the expiration of the 180 day period mandated by Congress. At plaintiff's invitation, the EEOC issued a Notice of Right to Sue on March 23, 2000, prior to its completion of the investigation of her

claims. Plaintiff filed this lawsuit on April 13, 2000, before 180 days had elapsed from the date of filing with the EEOC.

## II. Summary Judgment Standards.

The standards and procedures for summary judgment are well established and will not be fully repeated here. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In essence, summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Id.* A disputed fact is "material" if it might affect the outcome of the suit under the governing law, and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. Discussion.

### A. Sexual Harassment Claim under Title VII.

■ The court first rejects defendant's argument that plaintiff's sexual harassment claim should be dismissed for failure to exhaust administrative remedies. Relying on *Martini v. Federal National Mortgage Ass'n.*, 178 F.3d 1336 (D.C.Cir.1999), defendant argues that the claim is barred because plaintiff requested and received a right-to-sue notice from the EEOC and then filed this action before the expiration of the 180 day period contemplated by 42 U.S.C. § 2000e–5. Shortly after defendant's initial brief was filed, the Tenth

Circuit rejected the reasoning of Martini and concluded that the EEOC's regulation permitting early right-to-sue notices was valid and consistent with Title VII. *Walker v. United Parcel Service, Inc.*, 240 F.3d 1268, 1276–77 (10th Cir.2001). The court thus finds that plaintiff properly exhausted her administrative remedies on the claim of sexual harassment.

In her complaint and in the Pretrial Order, plaintiff asserts both a "quid pro quo" and a "hostile environment" theory of sexual harassment. Defendant argues the uncontroverted facts will not support either theory. As will be explained below, the court agrees there is no support for a quid pro quo theory, but finds a genuine issue of fact as to whether plaintiff was subjected to discrimination by virtue of a hostile work environment.

■ "Quid pro quo" harassment traditionally refers to cases where a supervisor retaliates against a subordinate for refusing to grant the supervisor's request for sexual acts. See *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 751, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).[3] Plaintiff has cited no evidence that Randy Shrauner requested sexual favors from her or that he retaliated because she refused to grant such favors. Most of plaintiff's discussion of quid pro quo harassment (see Doc. 31 at 17–22) is not even relevant to the issue at hand. The court finds, however, that plaintiff has cited evidence from which a jury could find in her favor under a hostile work environment theory of sexual harassment. Title VII's prohibition on discrimination on account of sex may be violated where a supervisor creates an abusive working environment because of an em-

---

**3.** The Supreme Court has noted that "[t]he terms quid pro quo and hostile work environment are helpful, perhaps, in making a rough demarcation between cases in which threats [by a supervisor] are carried out and those

where they are not or are absent altogether, but beyond this are of limited utility." *Ellerth*, 524 U.S. 742, 751, 118 S.Ct. 2257 (1998).

ployee's gender. See *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). For such a "hostile environment" claim to survive a summary judgment motion, " 'a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Penry v. Federal Home Loan Bank of Topeka,* 155 F.3d 1257, 1264 (10th Cir.1998). "In deciding whether or not a hostile environment existed, it is necessary to look to all the circumstances involved in the situation. These may include 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Nieto v. Kapoor,* 268 F.3d 1208, 1218 (10th Cir.2001) (citing *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) and *Lockard v. Pizza Hut, Inc.,* 162 F.3d 1062 (10th Cir.1998)).

Plaintiff has cited evidence that her supervisor repeatedly and persistently referred to her in derogatory terms related to gender, such as "tit-less," or in derogatory terms he did not use with male employees, such as "skinny ass." She has cited evidence that Shrauner engaged in other gender-related conduct in the workplace for the apparent purpose of humiliating her, such as surprising her with graphic pictures of nude men and spreading rumors about her ex-husband's anatomy. There is no evidence that he attempted to humiliate any male employees in this fashion. His conduct apparently prompted one of plaintiff's co-workers to show her a graphic picture and ask if the man in the picture was "hung like her ex-husband." There is evidence that Shrauner would frequently make kissing movements with his lips when plaintiff walked by. The record contains evidence that Shrauner regularly referred to female employees as having "nice tits" or a "nice ass," that he stared at them in a leering fashion, and he would frequently state while looking at female employees that he "wanted some of that." He sometimes engaged in sexual gestures in plaintiff's presence with one of plaintiff's co-workers, whom he also supervised, and when plaintiff complained that this made her uncomfortable, he told her she needed to get along. There is evidence that Shrauner threatened plaintiff on at least one occasion after he accused her (falsely, according to plaintiff's testimony) of spreading rumors about him.[4] Plaintiff cites evidence that she repeatedly complained to management about Shrauner's harassing behavior but that nothing was done to stop it. There is evidence that after she complained, Shrauner threatened plaintiff's job, called her a "whore" and showed up more frequently in plaintiff's area and "rode her butt." There is evidence that plaintiff suffered serious physical and emotional problems related to her treatment at work.

A jury may or might not find plaintiff's account to be credible, but assuming it is true, as the court must at this stage, plaintiff has cited sufficient evidence to preclude summary judgment on her sexual harassment claim. Defendant argues strenuously that the evidence shows only boorish behavior of a type the courts have said is not sufficiently severe or pervasive, and argues that plaintiff's claim must be evaluated "in the context of a blue collar environment where crude language is commonly used by male and female employ-

---

4. There is also some evidence of a threatening phone call by Shrauner to plaintiff and her boyfriend, although the context of that threat is somewhat unclear from the record.

ees." *Quoting Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1538 (10th Cir.1995). That may be true, but at the same time there is no "machine shop exception" to the employment laws of the United States. Summary judgment may indeed be appropriate where a supervisor does nothing more than use coarse or offensive language. In this case, however, plaintiff has cited evidence that matters went beyond the mere use of vulgarity. Plaintiff has pointed to evidence that her supervisor engaged in gender-related conduct designed to humiliate her, that he responded to complaints from her by saying things such as, "It's not like we're talking about your pussy," and that after she complained of sexual harassment he warned her not "to fuck with me if you want to keep your job" and called her a "whore." There is evidence that Shrauner subsequently made a veiled threat to plaintiff, including a statement that there was "more than one way to skin a cat" and he was going to "get her." Defendant argues these threats were unrelated to gender, but given the substantial evidence of gender-related animus on the part of plaintiff's supervisor, the court concludes that a genuine issue of fact exists on that point. In sum, the court concludes there is evidence from which a reasonable jury could find that the workplace was permeated with discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment. Cf. *Gross*, 53 F.3d at 1545 (no evidence that the supervisor used a gender-based vulgarity in reference to the plaintiff or that he engaged in any physically threatening conduct).

**B. Pregnancy Discrimination.**

Plaintiff contends that Leon Black's refusal to accommodate her doctor's restrictions when she was pregnant constituted unlawful sex discrimination. See 42 U.S.C. § 2000e(k) ("The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work...."). The defendant argues this claim fails because it is untimely and because the evidence will not support a prima facie case.

Defendant believes the claim is untimely because plaintiff did not file a complaint with the EEOC relating to pregnancy discrimination until October 22, 1999, well over 300 days after the alleged discrimination.[5] Plaintiff concedes her EEOC filing was outside the 300 day period, but argues the claim falls under the "continuing violation" doctrine of *Martin v. Nannie & the Newborns, Inc.*, 3 F.3d 1410 (10th Cir. 1993), because the pregnancy discrimination was "a continuing action of the sexually hostile work environment toward women which exists" at Eck & Eck. Pl. Mem. at 36–37.

To fall within the continuing violation doctrine, the plaintiff must show either: (1) a series of related acts taken against a single individual, one or more of which falls within the limitations period, or (2) the maintenance of a company-wide policy of discrimination both before and during

---

**5.** The alleged pregnancy discrimination occurred on or about November 3, 1998. Plaintiff was given a release to return to work without restrictions on November 16, 1998. Exh. 12. Under 42 U.S.C. § 2000e–5(e)(1), plaintiff was required to file a charge of discrimination with the EEOC or equivalent state agency within 300 days after the alleged unlawful employment practice.

the limitations period. *Purrington v. University of Utah,* 996 F.2d 1025, 1028 (10th Cir.1993). Three factors are relevant to whether a party has shown a continuing violation through a series of related acts: "(1) whether the alleged acts involve the same type of violation; (2) whether the acts are recurring versus isolated; and perhaps most important; (3) whether the acts have the degree of permanence which should alert the employee to the duty to assert her rights." *Id.* After considering these standards, the court concludes plaintiff has cited evidence that the alleged pregnancy discrimination was part and parcel of an ongoing pattern of discrimination and the claim is related to her EEOC complaint of a hostile work environment based on sex. Cf. *Purrington,* 996 F.2d at 1028 (a claim for hostile environment usually involves a continuing violation). Because the latter claim was timely filed with the EEOC, plaintiff's allegations of pregnancy discrimination will be considered timely under the continuing violation doctrine. The court further concludes that the evidence cited by plaintiff is sufficient to raise a genuine issue of fact as to whether the defendant engaged in unlawful discrimination on account of pregnancy. Plaintiff has cited direct evidence of a discriminatory intent on the part of the General Manager of the company, who, when confronted with the fact of plaintiff's pregnancy and her pregnancy-related restrictions, dismissed the pregnancy as her "problem," offered plaintiff the choice of losing the restrictions or losing her job, and told plaintiff to clean herself up and get back to work. In view of this direct evidence of a discriminatory animus, defendant's argument that plaintiff has not shown she was treated less favorably than individuals with non-pregnancy related re-

strictions is unpersuasive. Accordingly, defendant's motion for summary judgment will be denied with respect to the claim of pregnancy discrimination.

**C. Intentional Infliction of Emotional Distress.**

◼ Defendant argues the evidence will not support plaintiff's claim for intentional infliction of emotional distress under Kansas law. In response, plaintiff contends her claim is viable due to the fact that she suffered physical symptoms and because of the defendant's "extreme and outrageous conduct of long ignoring, condoning and acquiescing to the egregious sexual harassment. . . ." Pl. Mem. at 42.[6]

Plaintiff is basically recasting her sexual harassment allegations in the mold of a state tort claim, something the Kansas courts have generally not permitted. See *Beam v. Concord Hospitality, Inc.,* 873 F.Supp. 491, 501 (D.Kan.1994) ("The Kansas courts have been reluctant to extend the outrage cause of action to discrimination claims, including claims of sexual harassment, arising in the employment setting."). Kansas law might allow such a claim in the employment context if, for instance, the case involved repeated physical threats and sexually abusive language. See *Land v. Midwest Office Technology, Inc.,* 114 F.Supp.2d 1121, 1144 (D.Kan. 2000). Plaintiff has cited no such evidence here. The mere fact that her supervisor threatened to "get her" does not rise to the level of outrageous behavior that would support a claim for outrage or intentional infliction of emotional distress. Cf. *Penry v. Fed. Home Loan Bank,* 155 F.3d 1257, 1264 (10th Cir.1998) (citing *Moore v. State Bank of Burden,* 240 Kan. 382, 729 P.2d 1205 (1986)) (Conduct is not extreme and

---

6. In her memorandum, plaintiff argues the evidence will support a claim for "negligent and/or intentional infliction of emotional dis-

tress." The Pretrial Order was amended to delete the claim for negligent infliction of emotional distress. Doc. 30 at p. 2.

outrageous unless it is regarded as being "beyond the bounds of decency and utterly intolerable in a civilized society.").

### D. Negligent Hiring, Supervision and Retention.

■ Defendant argues that plaintiff's claim for negligent hiring, retention and supervision is also precluded under the facts of this case. The court agrees. "It is clear that Kansas courts do not accept a theory of liability for negligent supervision when the underlying behavior is an employee's sexual harassment of plaintiff." *Fiscus v. Triumph Group Operations, Inc.*, 24 F.Supp.2d 1229, 1242 (D.Kan.1998) (citations omitted). As the court noted in *Schweitzer–Reschke v. Avnet, Inc.*, 874 F.Supp. 1187, 1198 (D.Kan.1995):

> While it appears that Kansas would recognize a cause of action holding an employer liable for negligent retention or supervision under certain circumstances, it is far from clear that Kansas would recognize or permit recovery against an employer for negligent infliction of emotional distress based on negligent supervision where the underlying wrongful conduct is sexual harassment by an employee. Cf. *Anspach v. Tomkins Industries, Inc.*, 817 F.Supp. 1499, 1519–20 (D.Kan.1993) (refusing to hold employer liable for negligence based on employee's violation of Title VII). If faced with the issue, the court believes Kansas would not expand the scope of employer liability to include negligent infliction of emotional distress based on negligent retention or supervision of an employee where the aggrieved plaintiff already has an adequate remedy under Kansas statutory law. Pursuant to the KAAD, an aggrieved party may bring an action against an employer for sexual harassment. K.S.A. § 44–1001 et seq.

Kansas courts would not recognize a tort to accomplish the same purpose. Cf. *Polson v. Davis*, 895 F.2d 705, 709–10 (10th Cir.1990) (extension of recovery under tort of wrongful discharge not permitted where it would transgress the KAAD, adequate and exclusive remedies under the KAAD precluded recovery); see also *Beam v. Concord Hospitality, Inc.*, 93–4188–SAC, 1994 WL 129979, at *6 (D.Kan. March 29, 1994) (no cause of action exists under Kansas common law for failure to provide a safe work place arising out of incidents of sexual harassment on the job, but declined to rule on negligent supervision issue) (citing *E.E.O.C. v. General Motors Corp.*, 713 F.Supp. 1394, 1396 (D.Kan.1989)).

Plaintiff has cited no exceptional circumstances that would warrant application of a different rule. Accordingly, the court concludes the defendant is entitled to summary judgment on plaintiff's claim of negligence.

### E. State Law Claim for Retaliation.

Plaintiff next asserts a claim for retaliation that, according to the complaint and Pretrial Order, is based on state law. In its motion for summary judgment, defendant first argues that this claim is based solely on state common law and is therefore precluded by the exclusive state remedy of the Kansas Act Against Discrimination ("KAAD"). Plaintiff's response to this leaves something to be desired, as it essentially ignores any distinction between federal and state law or between statutory and common law. In the final sentence of her discussion of the issue, plaintiff asserts that "[r]etaliation is strictly prohibited by K.S.A. 44–1009(a)(4)." Pl. Mem. at 40. The court will construe this as an assertion that plaintiff's claim is based on the KAAD.[7]

---

7. Although defendant argues this claim is based solely on common law, the Pretrial Order is ambiguous on that point, as it states only that the claim is based on "state law." Doc. 30 at p. 3.

As the defendant points out, there is no evidence in the record that plaintiff filed a complaint with the Kansas Human Rights Commission or that she exhausted her state administrative remedies on that claim. Accordingly, the court concludes that plaintiff's state law claim for retaliation must be dismissed without prejudice for failure to exhaust administrative remedies. See *Hughs v. Valley State Bank*, 26 Kan.App.2d 631, 994 P.2d 1079 (1999).

IV. Conclusion.

Defendant's Motion for Summary Judgment (Doc. 28) is GRANTED IN PART and DENIED IN PART. Summary judgment is DENIED with respect to plaintiff's claims under Title VII for sexual harassment and pregnancy discrimination. Summary judgment is GRANTED in favor of defendant on plaintiff's state law claims of negligent hiring, supervision and retention and intentional infliction of emotional distress, and such claims are dismissed on the merits. Summary judgment is also GRANTED in favor of defendant on plaintiff's state law claim of retaliation; such claim is dismissed without prejudice.